# STATE v. JOHN LLOYD O'NEILL.

216 N. W. 2d 822.

March 29, 1974—No. 41988.

*C. Paul Jones,* State Public Defender, and *David Essling,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, and *Theodore R. Rix, Vernon E. Bergstrom,* and *Michael McGlennen,* Assistant County Attorneys, for respondent.

Heard before Knutson, C. J., and Rogosheske, Peterson, and Kelly, JJ., and considered and decided by the court.

KELLY, JUSTICE.

On June 17, 1968, defendant, John Lloyd O'Neill, age 17, along with two companions, was arrested for violation of the Minneapolis gun ordinance. Thereafter, defendant was charged with and convicted of the murder of Edward Kuehn who had been killed a few days before defendant's arrest. Defendant appeals from this conviction of second-degree murder and also seeks review of the denial of postconviction relief. We affirm.

Defendant's conviction was for the killing of Edward Kuehn, a 51-year-old white male. Kuehn was killed on a north Minneapolis street by a small-caliber bullet shortly after midnight on the night of June 15, 1968.

On June 17, at about 1:30 a. m., Minneapolis police officers Danielson and Nelson while on patrol in their squad car received a radio report that three white males in a " '55 or '56 green Oldsmobile" bearing a certain license number had discharged a gun in a gasoline filling station and had bragged about shooting out street lights. Within one-half hour after the radio report, the officers observed the described automobile and followed it. The officers saw three white males in the car and then stopped the car. Officer Danielson got out of the driver's side of the squad car, stood behind the door, and drew his revolver. Officer Nelson moved behind a telephone pole with a shotgun to cover Officer Danielson. The officers ordered the three occupants to get out of the car stating: "Police. Get out of the car and put your hands over your head."

When defendant and his two companions emerged as instruct-

ed, Officer Danielson holstered his revolver and then patted them down for weapons. One of the three then volunteered: "If you are looking for the guns, they are in the car." When they searched the car, the officers found two small-caliber pistols— a Beretta under the front seat and a Ruger in the glove compartment.[1] The Beretta was later connected with the death of Edward Kuehn and its possession, control, and use was linked to defendant. The three were taken into custody for possessing guns in violation of a Minneapolis gun ordinance. Several live rounds of ammunition were also found in defendant's pockets.

Independent of this incident, Detective Russell J. Krueger who was assigned later that same morning to investigate the death of Edward Kuehn, received a phone call reporting that a 1956 Oldsmobile had been seen in the area of the Kuehn killing at the time of the shooting. When he discovered that three persons had been arrested that morning in a 1956 Oldsmobile for violation of the gun ordinance, Detective Krueger interviewed defendant's companions and obtained a statement from one of them, Philip Roehl, implicating defendant in Kuehn's death.

Thereafter, Detectives Krueger and O'Rourke went to the Juvenile Detention Center to interview defendant. Detective Krueger identified himself, advised defendant he was a suspect in Kuehn's death, and gave him a Miranda warning. In response, defendant became "very wild and upset." He stated that the last time he had cooperated with the police he had ended up in jail and began threatening the officers. The officers terminated any attempt to question defendant at this time but returned about 1½ to 2 hours later. They again advised defendant of his rights and told him of Roehl's statement implicating him in the killing. They asked defendant to drop his trousers to determine if there

---

[1] Defendant's two companions testified that within an hour before they were stopped, defendant had fired the Beretta at the filling station and at street lights. Thus, there was only a very short time between the filling station episode and the investigation and arrest. It is not realistic to claim police had time to obtain a warrant.

were any bullet holes in them or wounds on his legs. This was to substantiate other information which had been received that defendant on the night of Kuehn's killing had shown such evidence to others claiming that a man had shot at him twice before he had fired. The officers told defendant that they were trying to determine whether Kuehn's death was murder or manslaughter. There was some discussion that defendant was a juvenile, but the officers did not know if he would be treated as an adult if charged with Kuehn's death. Defendant stated: "I don't deny it, but I would like to talk to my father or my brother first." Questioning stopped at this time, and the next day, in the presence of his father and brother, defendant made no further statement.

On July 3, 1968, juvenile court waived its jurisdiction over defendant and referred him for prosecution as an adult. On July 15, 1968, defendant was indicted for murder in the first degree. After being convicted of second-degree murder on October 18, 1968, defendant appealed. Upon motion to this court, the appeal was stayed pending a postconviction hearing. Defendant also seeks review of the denial of postconviction relief.

■ The first issue raised by defendant is that evidence discovered at the time of arrest or as a result of jail detention was inadmissible because it resulted from an improper arrest. It is argued that the arrest was improper because the misdemeanor offense for which defendant was arrested was not committed in the presence of the officers. In discussing this issue, it is helpful to restate the sequence of events leading to defendant's arrest for violation of the Minneapolis gun ordinance. The police stopped a vehicle whose three occupants were believed with good reason to have been involved a short time earlier in discharging firearms in a gasoline filling station and shooting out street lights. With their weapons ready, the officers asked the three occupants of the vehicle to get out with their hands above their heads. After patting them down for weapons, one of the occupants spontaneously informed the officers that the guns were

in the car. When the guns were found in the car, the occupants were taken into custody.

Minn. St. 629.34(1) permits a warrantless arrest for a misdemeanor violation only if the offense is committed in an officer's presence. In construing this requirement, we observed in State v. Pluth, 157 Minn. 145, 151, 195 N. W. 789, 791 (1923):

"* * * It cannot be said that a criminal offense is committed in the presence of an officer, unless the acts constituting the offense become known to him at the time they are committed through his sense of sight or through other senses."

In State v. Miller, 290 Minn. 33, 185 N. W. 2d 872 (1971), we held an arrest improper under the statute when it was based on information from police in a neighboring town that LSD was in the possession of individuals in a described vehicle. We held that even reliable hearsay information was never a substitute for personal observation by an officer making an arrest for a misdemeanor violation.[2]

---

[2] In at least one other jurisdiction, the result in Miller might have been different if the police stopped the defendant to investigate, and with probable cause, searched his coat and discovered LSD and then made an arrest. The Supreme Court of Maine in State v. Stone, 294 A. 2d 683 (Maine, 1972), based upon the United States Supreme Court cases, stated: "The prohibition in State law against a warrantless arrest of the person, upon probable cause, for a misdemeanor is not, ipso facto, absorbed into the federal constitution as an automatically controlling constitutional limitation upon warrantless searches and seizures of property in misdemeanor situations.

"The attempt to accomplish such constitutional restriction was explicitly repudiated in Carroll v. United States [267 U. S. 132, 45 S. Ct. 280, 69 L. ed. 543 (1923)].

\* \* \* \* \*

"First, the Carroll doctrine has been extended to cover not only contraband but also any 'articles that the officers are entitled to seize.' (399 U.S. p. 48, 90 S.Ct. p. 1979)

"Second, State law may constitutionally establish, within the outer limits of the 'reasonableness' criterion of the federal Fourth Amendment, that property is liable for search and seizure if it is the fruits of

However, the statutory limitation on misdemeanor arrests does not prevent the police from stopping persons and temporarily detaining them for questioning. A person who is engaged

or implements used to commit a crime or, as finally decided in Warden, Maryland Penitentiary v. Hayden, supra, evidence of a crime.

"Third, the kind of crime as to which State law may constitutionally make property subject to search and seizure, as the fruits of or instrumentality or evidence of such crime, may be either a misdemeanor or felony—as shown by Brinegar v. United States, 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949); Preston v. United States, 376 U. S. 364, 84 S. Ct. 881, 11 L. Ed. 2d 777 (1964), and Dyke v. Taylor Implement Manufacturing Co., Inc., 391 U. S. 216, 88 S. Ct. 1472, 20 L. Ed. 2d 538 (1968), all of which involved criminal activity punishable only at the misdemeanor level.

"Fourth, if State law has subjected property to search and seizure, by warrant, as fruits, or instrumentality or evidence of any crime— (misdemeanor or felony)—*so long as probable cause exists*, the warrant requirement may be constitutionally dispensed with if there are exigent circumstances which demand immediate search and seizure, or both, to prevent likelihood of removal, concealment, destruction or other loss of the articles lawfully subject to seizure provided, of course, that the search and seizure is limited as to method, place and time to be commensurate with such exigency.

\* \* \* \* \*

"It is, therefore, constitutional for the law of Maine (1) to follow the common law rule *denying* the right of a police officer upon probable cause (and even with exigent circumstances) to make a warrantless arrest of the person for a misdemeanor but yet (2) simultaneously to *authorize*, upon probable cause and in exigent circumstances, searches and seizures—(by methods and at times and places commensurate with the exigency presented)—of articles related to misdemeanor criminal behavior as the fruits, instrumentality or evidence of such criminal activity.

\* \* \* \* \*

"Since the law of Maine thus recognizes, foundationally, the lawfulness of such searches and seizures *upon issuance of a warrant* supported by probable cause, we hold (as we are constitutionally free to decide under Chambers v. Maroney) that the same searches and seizures may be made *without a warrant,* notwithstanding that the criminal conduct which makes the property lawfully subject to seizure is

in activity which arouses suspicion of criminal conduct can have his liberty restrained temporarily until the police have investigated the circumstances. Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. ed. 2d 889 (1968); State v. Armstrong, 292 Minn. 471, 194 N. W. 2d 293 (1972); State v. Valstad, 282 Minn. 301, 165 N. W. 2d 19 (1969); State v. Fish, 280 Minn. 163, 159 N. W. 2d 786 (1968). See, Cupp v. Murphy, 412 U. S. 291, 93 S. Ct. 2000, 36 L. ed. 2d 900 (1973). In Adams v. Williams, 407 U. S. 143, 145, 92 S. Ct. 1921, 1923, 32 L. ed. 2d 612, 616 (1972), it was observed:

"In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly (sic) criminal behavior even though there is no probable cause to make an arrest.' [Terry v. Ohio, 392 U. S. 1, 22, 88 S. Ct. 1868, 1880, 20 L. ed. 2d 889, 906 (1968)]. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

The facts of the Adams case were that an informant told a police officer that an individual in a nearby car was carrying narcotics and had a gun in his waistband. The officer approached the vehicle and asked the occupant to open the door. When he rolled down the window instead, the officer reached in and took the gun. The

only a misdemeanor; provided that (a) there is probable cause, (b) there are *accompanying exigent circumstances* which make procurement of the warrant impracticable, and (c) the methods, time and place are reasonable under all of the circumstances constituting the exigency, * * *." 294 A. 2d 690.

gun was not visible to the officer but was located exactly where the informant had said. The individual was then placed under arrest for unlawful possession of the gun.

In State v. Valstad, *supra,* police officers observed a vehicle whose description and license plate matched an automobile which had evaded police after a recent burglary. When the officers stopped the vehicle and were checking the identity of the driver, they observed burglary tools in the car. Defendant claimed that an arrest occurred when his automobile was initially stopped. We held that:

"* * * [T]he arrest did not occur when defendant was first detained by the officers but that the factual circumstances which developed shortly thereafter established probable cause for arrest without a warrant * * *." 282 Minn. 312, 165 N. W. 2d 26.

The fact that the detention stop for questioning is to investigate conduct only amounting to a misdemeanor does not remove a police officer's right to temporarily detain persons for questioning. The statute restricting misdemeanor arrests does not require personal observation by the police of suspicious activities before an investigatory stop can be made. In Adams v. Williams, 407 U. S. 143, 147, 92 S. Ct. 1921, 1924, 32 L. ed. 2d 612, 617 (1972), it was observed in approving a detention for investigation:

"In reaching this conclusion, we reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person."

In State v. Armstrong, 292 Minn. 471, 194 N. W. 2d 293 (1972), the police were summoned to investigate the theft of a purse. When an officer arrived, bystanders pointed out defendant as he was attempting to leave as the thief. The officer asked defendant to stop for questioning. When defendant put his hand into a bulging pocket, the officer, fearing his safety, asked defendant to empty his pocket. This revealed contents of the purse

and defendant was arrested. We held that the officer was justified in stopping defendant for investigation. In Armstrong, as in this case, there was only a stop to investigate possible misdemeanor violations and not an arrest until after further evidence was personally discovered by the officers.

We have recognized that there is a fine line between an arrest and an investigatory detention. State v. Fish, *supra;* State v. Armstrong, *supra.* It is not always apparent at what precise moment an arrest occurs. The action of the police officers must be judged according to the circumstances existing at the time. State v. Bell, 89 N. J. Super. 437, 215 A. 2d 369 (1965). But the determination whether an arrest occurs at the initial stop should not be decided solely by the conduct of the arresting officers or the amount of force they exhibit at the time. If an officer making a reasonable investigatory stop has cause to believe that the individual is armed, he is justified in proceeding cautiously with weapons ready.

In Adams v. Williams, *supra,* the Supreme Court said:

"The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. * * * The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *. So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." 407 U. S. 146, 92 S. Ct. 1923, 32 L. ed. 2d 617.

In Green v. United States, 275 A. 2d 555 (D. C. App. 1971), the police received a radio report that the occupants of a described automobile were using narcotics and carrying a gun. The officers observed a parked vehicle matching the description in the radio report. One officer approached the vehicle while his partner remained behind the squad car door with his pistol drawn. Defendant argued that this action of the police was an

arrest unsupported by probable cause and therefore evidence subsequently seized was inadmissible. The court held that an arrest had not occurred at this point.

"There had not been an imposition of custody at that point. The officer's use of a drawn pistol, while standing behind the door of the squad car, for the purpose of 'covering' his partner, did not constitute an arrest. * * * The radio call indicated the suspects had a gun and the officer's testimony revealed that the sole purpose of such action was for protection against potentially dangerous individuals and not to assert any custodial restraint. A reasonable man, in the defendant's shoes, innocent of any crime would not have thought he was under arrest." 275 A. 2d 556.

Under the circumstances in the instant case, with the officers knowing from the radio report that the occupants of the car were armed, the officers were justified for their own protection in holding the occupants at gunpoint until they were frisked for weapons. Although the weapons here were not discovered during this pat-down, we believe that the search of the vehicle for weapons was justified by the consent given. A warrantless search may be conducted when the subject of the search voluntarily consents to it, the voluntariness to be determined from the totality of the surrounding circumstances. Schneckloth v. Bustamonte, 412 U. S. 218, 93 S. Ct. 2041, 36 L. ed. 2d 854 (1973). In State v. Armstrong, 292 Minn. 471, 473, 194 N. W. 2d 293, 294 (1972), we said:

"* * * The prosecutor has the burden of proving the consent was freely and voluntarily given. It is not enough that the suspect yields to color of police authority. Had the officer's request been accompanied by force or threat of force, obviously the articles defendant revealed would not be admissible in evidence. Here, however, by defendant's own testimony, although he was 'adamant and uncooperative,' he acquiesced with minimum protest. Under these circumstances, the trial court was justified in not suppressing the evidence."

We hold that the spontaneous consent given in the present case to search the car was voluntary. Once the weapons were found, the misdemeanor violation of the gun ordinance had occurred in the officers' presence and it was permissible under the statute to arrest defendant at that point in time. The evidence discovered was therefore not a product of defendant's illegal arrest.[3]

■ The next issue raised by defendant is that his statement to the police while in custody—"I don't deny it, but I would like to talk to my father or my brother first"—should not have been admitted into evidence. Relying on the per se exclusionary rule expressed in Harling v. United States, 295 F. 2d 161 (D. C. Cir. 1961), he first argues that any statement by a minor prior to waiver of juvenile jurisdiction should be excluded in later criminal proceedings. We rejected this approach in State v. Loyd, 297 Minn. 442, 212 N. W. 2d 671 (1973), where we held that a juvenile's statement is admissible if after a proper Miranda warning he has not waived his rights under a mistaken belief that he was in the nonadversary, nonpunitive atmosphere of the juvenile system. The evidence here justifies a conclusion that defendant must have been aware of the adversary nature of the police interrogation.

The question remains, however, whether defendant invoked his right to remain silent at the first interview with the detectives. In Miranda v. Arizona, 384 U. S. 436, 473, 86 S. Ct. 1602, 1627, 16 L. ed. 2d 694, 723 (1966), it was stated:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (Italics supplied.)

Defendant's uncooperative manner and abusive language toward the detectives at the first interview must be interpreted as an

---

[3] We need not decide the constitutionality of the car search given the circumstances of this case but without the spontaneous consent to such a search. See footnote 2, *supra*.

indication that he did not wish to talk. But questioning ceased and the officers left. It has been held that the police are not precluded from returning and asking a person to reconsider his previous refusal to answer questions. Massimo v. United States, 463 F. 2d 1171 (2 Cir. 1972).

"* * * So long as such reconsideration is urged in a careful, noncoercive manner at not too great length and in the context that defendant's assertion of his right not to speak will be honored, it does not violate the Miranda mandate." United States v. Collins, 462 F. 2d 792, 797 (2 Cir. 1972).

We hold that it is not improper for the police to approach a defendant after his initial refusal to cooperate and ask him to reconsider his silence. As long as the urging to reconsider is not in any manner compulsive on a defendant and respects his asserted right not to speak, it is not constitutionally prohibited. This method is especially appropriate when, as here, a defendant's initial indication of a desire to remain silent is given before he has been fully apprised of the situation.

We also reject defendant's argument that a confession is inadmissible if it is followed in the same breath with a desire to remain silent. A confession is not improperly admitted merely because a defendant immediately thereafter wishes to remain silent.

■ Defendant next contends that the trial court erred in instructing the jury concerning permissible inferences of specific intent. The trial court instructed:

"The law permits an inference that a person intends the ordinary, natural and probable consequences of his voluntary acts. This is a disputable inference and may be overcome by evidence to the contrary. If and when the evidence shows that one person assaulted another voluntarily with a dangerous weapon likely to kill and which in fact did kill the person thus attacked, such evidence gives rise to a permissible inference that the assailant intended death or very great bodily harm. That permissible in-

72

ference, however, may be overcome by contrary evidence, and any such evidence is sufficient to overcome it which creates in the minds of the jurors a reasonable doubt that the defendant's intent was as so inferred. In the absence of evidence to the contrary, however, the inference may prevail."

The United States Supreme Court recently refused to overturn a state court conviction in which the jury was given the "presumption of truthfulness" instruction. Cupp v. Naughten, 414 U. S. 141, 94 S. Ct. 396, 38 L. ed. 2d 368 (1973). That instruction was objected to by defendant on the ground it placed the burden of proving innocence upon the defendant. The instruction was as follows:

"Every witness is presumed to speak the truth. This presumption may be overcome by the manner in which the witness testifies, by the nature of his or her testimony, by evidence affecting his or her character, interest, or motives, by contradictory evidence or by a presumption." 414 U. S. 142, 94 S. Ct. 398, 38 L. ed. 2d 371.

The Supreme Court commented as follows (414 U. S. 146, 94 S. Ct. 400, 38 L. ed. 2d 373):

"* * * Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

"In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. Boyd v. United States, 271 U. S. 104, 107 [46 S. Ct. 442, 443, 70 L. ed. 857, 859] (1926). While this does not mean that an instruction by itself may never rise to the level of constitutional error, see Cool v. United States, 409 U. S. 100

[93 S. Ct. 354, 34 L. ed. 2d 335] (1972), it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

"The Court of Appeals in this case stated that the effect of the instruction was to place the burden on respondent to prove his innocence. But the trial court gave, not once but twice, explicit instructions affirming the presumption of innocence and declaring the obligation of the State to prove guilt beyond a reasonable doubt. The Court of Appeals, recognizing that these other instructions had been given, nevertheless declared that 'there was no instruction specifically directed to that under attack as can be said to have effected a cure.' But we believe this analysis puts the cart before the horse; the question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.

"This Court has recently held that the Due Process Clause requires the State in criminal prosecutions to prove guilt beyond a reasonable doubt. In re Winship, 397 U. S. 358 [90 S. Ct. 1068, 25 L. ed. 2d 368] (1970). * * *

"We imply no retreat from the doctrine of Winship when we observe that it was a different case from that before us now. There the trial judge made an express finding that the State was not required to prove guilt beyond a reasonable doubt; in this case the State's burden of proof was emphasized and re-emphasized in the course of the complete jury instructions."

We have held that presumptions cannot be used in criminal cases to establish an essential element of the offense because it casts on defendant the burden of proving his innocence. State

ex rel. Geiselhart v. Tahash, 274 Minn. 464, 144 N. W. 2d 354 (1966); State v. Edwards, 269 Minn. 343, 130 N. W. 2d 623 (1964); State v. Higgen, 257 Minn. 46, 99 N. W. 2d 902 (1959). Defendant argues that the same rationale should prohibit inferences of elements of a crime.

Inferences of intent can be drawn from circumstantial evidence. State v. Valstad, 282 Minn. 301, 165 N. W. 2d 19 (1969). In Turner v. United States, 396 U. S. 398, 417, 90 S. Ct. 642, 653, 24 L. ed. 2d 610, 624 (1970), the United States Supreme Court approved an inference of "knowledge" from the facts of possessing smuggled heroin because "'[c]ommon sense' * * * tells us that those who traffic in heroin will inevitably become aware that the product they deal in is smuggled." Although we do not approve of the trial court's instruction on inferences, we do not believe it prejudiced defendant in the present case. We have reviewed the trial court's instructions as a whole. Those relating to the burden of proof are as follows:

"* * * Therefore, it becomes necessary for the State of Minnesota to prove each essential element of the crime charged in the Indictment to the degree hereinafter stated in order to establish the defendant's guilt.

\* \* \* \* \*

"The defendant having entered a plea of not guilty, you are instructed that it is the law that he is presumed to be innocent of the charge that has been made against him until you are satisfied by evidence of his guilt beyond a reasonable doubt. * * *

"It is also the law necessarily incident to this presumption of innocence that the burden of proof rests upon the State to prove the defendant guilty of the charge beyond a reasonable doubt. * * *

"* * * The State, however, must prove beyond a reasonable doubt each essential element of the crime charged in order to justify a conviction.

\* \* \* \* \*

"* * * Murder in the Second Degree is defined as follows by

statute: 'Whoever causes the death of a human being with intent to effect the death of such person or another, but without premeditation, is guilty of Murder in the Second Degree.' The essential elements of this lesser offense, namely Murder in the Second Degree, each element of which the State is required to prove beyond a reasonable doubt in order to convict the defendant of Murder in the Second Degree are: * * * (3) That such killing was done with a design to kill, but not with a premeditated design to kill.

\* \* \* \* \*

"* * * [A]nd, further and very important, it is for you to say what reasonable conclusions and deductions, if any, are to be drawn from the evidence.

"* * * The defendant does not have to prove himself innocent. The State must prove him guilty."

Viewing the instruction complained of in the context of the overall charge, we do not believe the instruction complained of cast the burden on defendant of proving his innocence.

■ Finally, we have reviewed the record in this case and find no merit in defendant's contention that he was denied effective representation by his self-retained counsel. In absence of a showing to the contrary, representation is presumed competent and will not be held constitutionally defective unless so inadequate as to amount to a sham. State v. Walter, 289 Minn. 309, 184 N. W. 2d 426 (1971); State v. Fields, 279 Minn. 374, 157 N. W. 2d 61 (1968); State v. Waldron, 273 Minn. 57, 139 N. W. 2d 785 (1966).

Affirmed.

MR. CHIEF JUSTICE SHERAN, MR. JUSTICE YETKA, and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.