STATE of Minnesota, Respondent,

v.

Jean Beverly LINK, Appellant.

No. 48818.

Supreme Court of Minnesota.

Sept. 21, 1979.

Doyle & Michales and Stephen Patrick Doyle, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, Chief, App. Section, and David W. Larson, Asst. County Atty., Minneapolis, for respondent.

Heard before SHERAN, C. J., TODD and MAXWELL, JJ., and considered and decided by the court en banc.

SHERAN, Chief Justice.

This is an appeal by Jean Beverly Link from her conviction for the first-degree murder of Lueberta Davis and her two young children on January 19, 1978. There is no dispute that Link was extensively involved in the scheme culminating in the three deaths; the primary issue at trial was whether she played her role knowing murder was the ultimate objective. The jury found that she did. Though we conclude that at least one error was committed at the trial, we have found no prejudicial effect on the jury's verdict. Accordingly, we affirm.

The scheme to murder Davis was master-minded by James Black, at the time an inmate at the Hennepin County jail. Link met Black during the summer of 1976, when he was an inmate at Stillwater and she was doing an internship there while studying at Mankato State to become a corrections counselor. A romantic attachment developed, and in the fall of 1976 they had what Link believed to be a marriage ceremony at the prison. Black was released in February, 1977. Though Link became pregnant and bore a baby girl, the marriage relationship deteriorated, and Black apparently lived with a woman named LuAnn Martin during the summer of 1977.

Contact between Black and Link was reestablished in October of 1977, when he was arrested for robbery and eventually charged with at least nine offenses. His arrest was made possible by Lueberta Davis, who was discovered retrieving the getaway car and whose daughter told police where Black could be found. This event, and the possession by Davis of information linking Black to other crimes, supplied the motive for her murder.

On January 9, 1978, Black called Link from prison. According to Link, he asked her to "hire somebody * * * to kill a girl." Link had a long conversation about this request with her friends Jackie and Ron Johnson. Ron Johnson testified that Black's instructions to Link were even more specific—he wanted her to "go to some lady's house and make friends with the lady and wait until the lady was sleeping, pour gasoline around the house, and set it on fire."

The conversation with the Johnsons is particularly incriminating given Link's defense that she did not know Davis was to be murdered on January 19. The Johnsons' testimony indicates that Link was aware of Black's desire to have someone murdered as of January 9, and she may even have known by then that Black had death by burning in mind. Furthermore, Link asked Ron Johnson if he would find someone to commit the murder.

On January 12, at Black's instruction, Link bought two cans of gas. Black told her to go over to Davis' house that night and set the house on fire after Davis was asleep. Link admitted that she was at the Davis house on the 12th, but said she left the gas at home. She also testified that she became frightened and left because it was apparent that Black and Davis were involved with each other and perhaps it was she, Link, who was being "set up."

Link testified that on January 13 she was told by a messenger that all Black wanted was some clothes, possible evidence against him, burned. Black himself told her this on January 14.

On January 17, Black gave Link instructions to assist a friend of his, Dale Olson, who was to be released from jail on January 19. She was to vouch for him if the judge asked if he had a place to stay. Link did meet Olson at the courthouse on the morning of the 19th, though she was asked no questions by the judge. Link also talked with Black at the jail for about ten minutes that day. She said Black told her to take the gas, pick up Olson that night, and take him to the Davis house. Based on Black's prior statements, Link assumed Olson was going to burn the clothes.

Link followed these instructions that evening. When she picked Olson up, he told his companions they were going to burn some clothes. When they arrived at the Davis residence, Link refused Olson's request to come in because she was afraid she was being set up. Olson went in alone, and after about a half hour came running out with his pants leg on fire and said, "Let's go!"

Shortly thereafter, police found that Lueberta Davis and her six-year-old daughter Tesa, had been tied to beds with piano wire and burned alive. Davis' two-year-old son LaMarr was found under a bed, also burned to death. There were unmistakable signs of arson. Link testified that there is no doubt in her mind that Olson committed the murders, but at the time she did not know what he was going to do and had no intention of hurting anyone. It was this

and related testimony which was necessarily discredited by the jury in arriving at its guilty verdict.

1. The most serious issue raised by Link concerns the admission of *"Spreigl"* evidence that she had been involved in another scheme of Black's to murder a potential witness against him. Link contends that, while such a scheme may well have existed, it was not carried out and there is no evidence that she was aware of it.

The challenged evidence was presented through the testimony of three witnesses. Janice Symchych, an assistant county attorney, was responsible for the prosecution of certain robbery charges against James Black. LuAnn Martin, with whom James Black lived in the summer of 1977, was charged with assisting Black with one of the robberies. Ms. Symchych testified that a plea bargain was entered into on December 14, 1977, whereby the state recommended probation for Martin in return for her testimony against Black in four robbery cases.

Charles Thomas, a fellow inmate of Black's in the Hennepin County jail at this time, testified that Black asked him to kill Martin. Black said he would have Thomas bailed out and his wife "Jean" would show him where Martin lived. Black gave Thomas a phone number which the police learned was, in fact, Link's. Shortly after these conversations, the bail bondsman's secretary came to Thomas with bail papers, which he signed. He expected to be released shortly but discovered his bail, which was $1,000, had been raised to $10,000 due to the addition of another charge. Black was upset and said he would tell "Jean" to get his money back. Thomas testified that he did not intend to kill Martin, but only wanted to get out of jail. Thomas never met or talked to Link.

The third witness was Joyce Parkin, a bail bondsperson for Ray Chisolm Bonding Service. She testified that in December, 1977, Jean Link asked her to bail out Charles Thomas. Link said Thomas was her boyfriend and she needed him to help take care of her baby. Parkin was unable to get Thomas out because when she went to post the bond, another charge with $10,000 bail had been added.

■ There is no need to reiterate here the antipathy of this court to evidence of crimes other than that for which the defendant is on trial, and the restrictions and procedural safeguards we have established to safeguard the defendant from unfair prejudice. *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965); *State v. Billstrom,* 276 Minn. 174, 149 N.W.2d 281 (1967); Rule 404(b), Minnesota Rules of Evidence. In the case of this evidence, the proper procedures for its admission were followed, and it was relevant and admissible under Rule 404(b) to show intent, knowledge, or absence of mistake. One critical requisite for admissibility was absent, however. We stated in *Billstrom, supra* :

> "The evidence of defendant's participation in other crimes need not be proved beyond a reasonable doubt but must be clear and convincing." 276 Minn. 179, 149 N.W.2d 285.

■ None of the testimony of the three witnesses establishes clearly and convincingly that Link participated in the conspiracy to kill Martin. Her attempt to bail out Thomas was a perfectly legitimate procedure available to any citizen. Participation in the crime would have required knowledge of the purpose of his release. The only evidence of such knowledge to which the state is able to point is her lie to the bondsperson that Thomas was her boyfriend. Though such a falsehood suggests an awareness of a nefarious purpose, it does not rise to the level of clear and convincing evidence because of the likelihood that such a lie would be told just to achieve cooperation and sympathy from the bondsperson.

The situation here is particularly like that in *United States v. Clemons,* 503 F.2d 486 (8 Cir. 1974). There, the defendant was tried for possession of heroin with intent to distribute. The prosecution introduced evidence that two months after his arrest for that crime he had been arrested while driving a car in which was concealed a large

quantity of heroin. He was not the owner of the car and was never charged with a crime following that arrest. The Eighth Circuit reversed because there was no more evidence of intent in the other crime than in the charged crime. The court said that evidence of other misconduct was admissible to show intent when such conduct was unlikely to be committed without knowledge or intent, but, "Where, however, the prior conduct has been equally consistent with an innocent explanation or is simply too incomplete, we have reversed." The court concluded; "We think that the government failed to prove by clear and convincing evidence that Clemons did commit another similar offense." 503 F.2d 490.

■ While recognizing the discretion accorded the trial judge in determining the admissibility of evidence and the imprecise nature of the clear and convincing standard, we have concluded that the evidence of Link's participation in the scheme to kill Martin was not clear and convincing as a matter of law, and its admission was therefore error.

■ There remains the crucial question of the effect of the error. In this case we have no reasonable doubt that the erroneously admitted evidence was not prejudicial to the result, and reversal is consequently not called for. The evidence of guilt here was overwhelming. Since Link's actions in purchasing the gasoline, picking up Olson, and waiting outside while he set the house on fire are admitted, her defense is that she lacked knowledge of his purpose and believed he was only going to burn clothes. Yet the testimony of the Johnsons indicates that Link knew by January 9 that Black wanted "a girl" killed. Whether or not she knew on that date that the death was to be by fire, she certainly knew so by January 12, when Black told her to go to Davis' house, pour gas around after Davis was asleep, and set the house afire. For her to then contend that when she took Olson and the gas to Davis' house one week later she was unaware of his purpose requires the fact finder to believe that her mental state left her totally out of touch with reality—a

circumstance which the evidence of her fear and confusion does not even begin to indicate.

Given this overwhelming evidence, of what impact was the testimony regarding the prior scheme to kill Martin? It tended to show that she followed Black's instructions, but given the large amount of other uncontradicted evidence on this point, it was in this respect merely cumulative. As for her willingness to murder for Black, the Martin evidence does not show this and the jury most probably recognized this insufficiency. Any juror who was willing to make the leap required to believe that Link knew of Thomas' criminal purpose was also undoubtedly already convinced by the much greater evidence of her knowledge of Olson's criminal purpose.

■ We are fully aware that, once an error in a criminal trial has been identified, the determination of whether a single juror might, absent the error, have held out for acquittal is one of the most difficult judgments a reviewing court is ever called upon to make. Yet it cannot be avoided. As we said in *State v. Mitchell*, 268 Minn. 513, 521, 130 N.W.2d 128, 133 (1964), "Few records in criminal cases are entirely free from error." Thus, if there is ever to be finality in the criminal justice system, a harmless error doctrine is essential. Nevertheless, such a doctrine would never be—and is not here—applied by this court to bar a reversal otherwise called for were there any doubt or hesitation in our minds. Given the extent of legitimate proof in this case and the dubious impact of the erroneously admitted evidence, the error was harmless and we decline to order a reversal.

2. The second issue raised by Link concerns the propriety under the Fifth Amendment of police questioning and the giving of a second *Miranda* warning after her initial refusal to answer questions.

Link was arrested at 8:00 p. m. on January 20, the day after the murder, as she arrived home with her baby. The arresting officer advised her of her *Miranda* rights and asked if she wanted to talk to him.

She replied she did not. Shortly thereafter, Lieutenant James Breen, who was in charge of the investigation, arrived with his partner. Link, riding in the back seat of the police car with Breen and her baby, was taken downtown to the Minneapolis Police Department. There is evidence that after her original refusal to talk, both the arresting officer and Lieutenant Breen asked her biographical questions and innocuous questions about the care of her baby and about a black Cadillac circling the police car.

After arriving at the police station and going upstairs to the homicide division, Lieutenant Breen advised Link of her *Miranda* rights once again. She was again asked if she would talk, and this time agreed. The time was about 9:10 p. m. There followed a long interrogation at the conclusion of which Link signed a statement.

 The questioning following the first *Miranda* warning was not unconstitutional. Biographical questions are not proscribed by *Miranda*. *State v. Widell*, 258 N.W.2d 795 (Minn.1977). Questions about the baby and the black Cadillac had nothing to do with investigating criminal activity, but were necessary to safely taking Link and her child into custody.

The question of a second *Miranda* warning is currently controlled in Minnesota by *State v. O'Neill*, 299 Minn. 60, 216 N.W.2d 822 (1974). The rule stated in that case is as follows:

"We hold that it is not improper for the police to approach a defendant after his initial refusal to cooperate and ask him to reconsider his silence. As long as the urging to reconsider is not in any manner compulsive on a defendant and respects his asserted right not to speak, it is not constitutionally prohibited." 299 Minn. 71, 216 N.W.2d 829.

 In this case there is no indication of compulsion or that Link's asserted right to speak was not respected. Compulsion would be evident were a second request to speak given under circumstances suggesting to a defendant that he would eventually be forced to abandon his right to silence. The situation here, where the second request was given at a different location by a different officer after Link had presumably reflected on the wisdom of continued silence, does not pose that danger. There was no violation of the Fifth Amendment.

3. Link's third claim is that the trial court erred in giving the following instruction to the jury: "The defense of duress is not applicable to this case." This was the result of a lengthy discussion with counsel over whether any instruction on duress should be given, or if it should be defined. Link contends this instruction was improper because duress had not been argued, nor had an instruction been requested. Duress, which admits intent, was logically inconsistent with Link's defense of lack of knowledge or intent. Moreover, Link contends the instruction was not harmless error, because fear and confusion were an important part of her explanation of how she could not have known what was going on, and the negative instruction may have impugned that explanation.

 Though the instruction was, without further explanation, probably of little assistance to the jury, it is not reversible error. The trial judge is in the best position to decide what instructions are necessary to the jury's decision, and his discretion must be respected. Moreover, the defense counsel, aware of the intended instruction, told the jury he did not claim duress, but merely fear and confusion, thus minimizing the impact of the instruction on his case. We cannot imagine how this one-sentence instruction, on a point explicitly conceded by the defense, had any impact on the trial one way or another.

 4. Finally, Link objects to several of the statements made by the prosecutor during closing argument. Link complains that the statements indicated her testimony was not evidence, implied the timing of her testimony was improper, and suggested she had a duty to testify. We have considered these statements in particular, and the prosecutor's closing argument in general, and find no error. Though the

prosecutor may have technically misphrased certain points, the thrust of his closing, while hard-hitting and no doubt effective, was not improper. He emphasized that Link had told one story to the police, but, after hearing the state's case at trial, had been forced by the realities of the situation to change that story by the time of her testimony at the end of the trial. The prosecutor was well within the scope of permissible argument in highlighting the incredibility of the defense and motive of the defendant in fabricating a defense. The jury ultimately convicted Link because it did not believe her testimony. That testimony differed from her statement to the police; the prosecutor commented on that fact but did not create it.

Affirmed.

WAHL, Justice (dissenting).

I concur with the holding of the majority that the evidence of Link's participation in Black's scheme to kill Martin was not clear and convincing as a matter of law and that its admission was error. I must respectfully dissent, however, from the further holding that the error was without prejudice to the result. Although there was substantial circumstantial evidence that Link was aware that Davis was to be murdered, it is logically possible that she was in fact a dupe. Evidence of the Martin murder plot, admissible under *Billstrom* only on a finding by the trial court that it was necessary to support the state's burden of proof, could only serve to diminish any doubt in the minds of the jurors as to Link's guilt and to suggest that she made it a habit to help Black kill other women. The effect of the error was, in my opinion, so prejudicial as to deny the defendant a fair trial. Difficult as such a decision would be under the tragic circumstances of this case, I would reverse and remand for a new trial without the erroneously admitted evidence.