*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0578**

State of Minnesota,
Respondent,

vs.

Otis Redmond Ware,
Appellant.

**Filed March 25, 2024
Affirmed
Wheelock, Judge**

Ramsey County District Court
File No. 62-CR-21-65

Keith Ellison, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Alexandra Meyer, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Rebecca Ireland, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Wheelock, Presiding Judge; Schmidt, Judge; and Reilly, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**WHEELOCK**, Judge

Appellant challenges his conviction and sentence for possession of a firearm by a prohibited person, arguing that (1) the officers did not have a reasonable, articulable suspicion to stop him and unlawfully exceeded the scope of the stop and (2) the district court abused its discretion by denying his motion for a downward dispositional departure from the statutory-minimum sentence. We affirm.

## FACTS

On January 4, 2021, around 3:00 p.m., the gang and gun unit of the St. Paul Police Department conducted an operation at an intersection in St. Paul. Uniformed officers cleared the intersection of civilians, then the officers promptly dispersed before civilians returned to the area, all while plainclothes officers surveilled the intersection. Among the people who returned after the uniformed officers cleared the area was appellant Otis Redmond Ware.

An officer watched as Ware walked to the back of a parked tan sport utility vehicle and reached for something under the vehicle, then went to a parked white sedan and did the same. The officer then heard a gunshot and saw Ware jump up, put something in his front pocket, and quickly walk away. The officer identified the gunshot as coming from underneath the white sedan. He relayed the information to other officers over the radio, and a second officer spotted a man matching Ware's description less than a block away. Over the radio, the second officer confirmed with the first that the man was the suspect, then the second officer initiated a stop.

The second officer ordered Ware onto the ground with his arms outstretched in a prone position, and Ware immediately complied. The second officer asked Ware if he had a gun, and Ware responded that he did, so the second officer radioed for backup. Because of the gang-and-gun-unit operation, numerous officers were in the area with radios turned on, and approximately ten officers responded to the request for backup within minutes. Officers handcuffed Ware and asked him if his gun accidentally went off, and Ware confirmed that it did. An officer then reached into Ware's pocket and retrieved a .380-caliber handgun with a loaded magazine. Officers helped Ware to his feet and placed him in a squad car. The entire encounter lasted ten minutes. Officers searched the scene of the gunshot and retrieved a .380-caliber bullet casing from under the white sedan.

Respondent State of Minnesota charged Ware with unlawful possession of a firearm under Minn. Stat. § 624.713, subd. 1(2) (2020). Ware moved to suppress the evidence from the encounter, arguing that the second officer conducted an unlawful stop and that it was also unlawful to expand the stop to search Ware. In September 2021, the district court denied the motion to suppress and determined that both the initial stop and subsequent arrest and search of Ware were lawful. Ware waived his right to a jury trial and proceeded to a stipulated-evidence trial pursuant to Minn. R. Crim. P. 26.01, subd. 3. In September 2022, the district court found Ware guilty.

Ware moved for a downward dispositional departure from the statutory-minimum sentence, arguing that he was particularly amenable to supervision and treatment in a probationary setting, and alternatively, he moved for a stay of the sentence pending this appeal. In January 2023, the district court sentenced Ware to 60 months in prison, the

3

statutory minimum, but stayed the sentence pending this appeal pursuant to Minn. R. Crim. P. 28.02, subd. 7.

Ware appeals.

**DECISION**

Ware argues that the district court erred by denying (1) his motion to suppress evidence as the fruit of an unlawful search and seizure and (2) his request for a downward dispositional departure from the statutory-minimum sentence.

**I.      The district court did not err by denying Ware's motion to suppress evidence because the officers lawfully stopped Ware and searched him incident to a lawful arrest.**

Ware makes two arguments that the stop and the search were unlawful. First, he argues that, because the first officer did not see Ware with a gun and provided only a vague description of Ware, the second officer's stop of him was unlawful under *Terry v. Ohio* as the officer did not have objective and particular facts to form the required reasonable, articulable suspicion for the stop. 392 U.S. 1, 21 (1968). Second, Ware argues that even if the initial stop was lawful, it became unlawful when the second officer responded with unreasonable force. To support this argument, Ware asserts that the initial suspicions that provided the basis for the stop were tenuous, that he complied with every request the second officer made, and that he was seized at gunpoint by ten officers.

The state responds that the second officer had a reasonable, articulable suspicion based on the totality of the circumstances, including the inferences of the trained officers. Furthermore, the state contends that officers may proceed with caution and a greater show of force when a suspect is armed and that the number of officers was reasonable in this

4

circumstance because a large number of officers were in the vicinity due to the gang-and-gun-unit operation.

The district court denied Ware's motion to suppress because the first and second officers had a reasonable, articulable suspicion that, when combined with their rational inferences, provided a lawful basis for the stop. The district court determined that the second officer's initial stop of Ware was lawful because the second officer received credible information from the first officer, who identified Ware as the source of the gunshot and saw him immediately stand up after the shot was fired and place something in his pocket. The district court balanced Ware's Fourth Amendment rights with the nature of the government's intrusion, determining that the officers did not exceed the scope of the *Terry* stop despite the use of force.

As part of its analysis of the scope and duration of the stop, the district court also determined that the officers searched Ware incident to a lawful arrest. The court specifically stated that *after* Ware admitted that his gun had fired accidentally, officers searched him incident to a valid arrest and discovered the .380-caliber handgun during that search. In his brief to this court, Ware did not distinguish between the stop, which occurred first in time, and the subsequent search, during which the officers located the firearm on his person. Because it is relevant to our analysis, we address the stop and the search separately below.

When the facts are not in dispute, we review pretrial orders on a motion to suppress evidence de novo to discern whether the police had an adequate basis for the search and seizure. *State v. Williams*, 794 N.W.2d 867, 871 (Minn. 2011).

5

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. If a search or seizure is unlawful, then any evidence obtained therefrom must be suppressed. *State v. Bradley*, 908 N.W.2d 366, 369 (Minn. App. 2018). "A *Terry* stop permits an officer who suspects that an individual is engaged in illegal activity and also believes that a suspect may be armed and dangerous to frisk the suspect in order to reduce concerns that the suspect poses a danger to officer safety." *State v. Flowers*, 734 N.W.2d 239, 250-51 (Minn. 2007). We review the validity of a *Terry* stop by applying a two-step inquiry: first, we consider "whether the stop was justified at its inception"; second, we consider whether the actions of the police during the stop "were reasonably related in scope to the circumstances that justified the stop." *State v. Balenger*, 667 N.W.2d 133, 137 (Minn. App. 2003) (quotation omitted), *rev. denied* (Minn. Oct. 21, 2003).

### A.    Initial Stop of Ware

To conduct a lawful *Terry* stop, officers must have a reasonable, articulable suspicion of criminal activity. *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008). This is not a high standard, but the suspicion must be based on specific, articulable facts that, when combined with rational inferences, warrant the brief stop. *State v. Pike*, 551 N.W.2d 919, 921-22 (Minn. 1996). Officers may use their training to make rational inferences and deductions. *State v. Smith*, 814 N.W.2d 346, 352 (Minn. 2012). An officer who has a reasonable belief that the suspect is armed "is justified in proceeding cautiously with weapons ready." *State v. Munson*, 594 N.W.2d 128, 137 (Minn. 1999) (quotation omitted). The reviewing court looks at the facts objectively and weighs the totality of the

6

circumstances to determine the reasonableness of the officer's conduct. *Balenger*, 667 N.W.2d at 139. The officer initiating a stop or an arrest may rely on information from other officers, and that knowledge is imputed to the officer initiating the stop or arrest. *State v. Conaway*, 319 N.W.2d 35, 40 (Minn. 1982).

Here, the second officer had a reasonable, articulable suspicion to stop Ware. The first officer observed Ware appear to retrieve items from underneath two different parked cars at an intersection under surveillance because of known drug and gang activity in the area. The first officer heard a single gunshot and identified the sound as coming from where Ware reached underneath the white sedan. The first officer observed Ware immediately place something in his pocket and hasten away from the vehicle. The first officer informed other officers over the radio that he heard a gunshot and provided the location and Ware's description. Relying on this information, the second officer stopped Ware moments later and only one block from the intersection, drew his weapon, and ordered Ware onto the ground. The second officer asked Ware if he had a gun, and Ware responded that he did, so the second officer radioed for backup.

The totality of the circumstances, including the officers' training and inferences, provided a reasonable, articulable suspicion for the second officer to stop Ware. Furthermore, because the first officer's observations provided a basis for a reasonable belief that Ware was armed, it was not unlawful for the second officer to approach Ware with his weapon drawn. Here, as in *State v. O'Neill*, a radio report informed an officer that the suspect was armed, so "the officer[ was] justified for their own protection in holding the [suspect] at gunpoint until they were frisked for weapons." 216 N.W.2d 822, 828

7

(Minn. 1974). Given these particular facts, the totality of the circumstances provided the second officer with reasonable, articulable suspicion to conduct a *Terry* stop with his weapon drawn.

**B.    Search of Ware**

Although a stop may be lawful at its inception, it may become unlawful if the the duration of the stop or the actions of the officers are not reasonably related to the circumstances that gave rise to the stop. *Balenger*, 667 N.W.2d at 139. There must be a balance between the individual's interest in the right to be free from unlawful searches and seizures and the government's interest in preventing crime and protecting officer safety. *Id.* To determine whether the officer's conduct exceeded the scope of the investigative stop, courts consider the aggressiveness and intrusiveness of the tactics used against their justifications. *Id.*

An officer may arrest a suspect without a warrant in a public place so long as the officer has probable cause to believe that person committed a felony. Minn. Stat. § 629.30, subd. 2(2) (2020); *State v. Dickey*, 827 N.W.2d 792, 798 (Minn. App. 2013). Recklessly discharging a firearm in a municipality is a felony. Minn. Stat. § 609.66, subd. 1a(a)(3) (2020). "Probable cause to arrest exists when a person of ordinary care and prudence, viewing the totality of the circumstances objectively, would entertain an honest and strong suspicion that a *specific* individual has committed a crime." *Williams*, 794 N.W.2d at 871 (quotation omitted). This inquiry is objective, and a court must consider all of the facts in an individual case. *Id.* If a person is lawfully arrested, then officers may conduct a search

8

of the person and the area within the person's control incident to that arrest. *Bradley*, 908 N.W.2d at 369.

Here, the officers did not pat Ware down as part of a *Terry* stop but reached into his pocket to remove the firearm pursuant to a lawful arrest. After the second officer stopped Ware and Ware confirmed that he had a gun, the second officer radioed for backup, which alerted every officer in the area. Because of the gang-and-gun-unit operation, there were more officers in the vicinity than usual, and several officers responded to the second officer's call for backup. Given these facts, the large number of officers who responded was not unreasonable and did not cause the stop to become unreasonable as Ware argues. After backup arrived, officers asked Ware whether he had fired the gun and Ware confirmed that he had, providing probable cause to arrest Ware for firing a gun within a municipality in violation of Minn. Stat. § 609.66, subd. 1a(a)(3). *See State v. Engle*, 743 N.W.2d 592, 596 (Minn. 2008) (holding that a person need not intend the discharge of a firearm to commit reckless discharge of a firearm within a municipality). The officers retrieved the firearm from Ware's pocket only after they had probable cause to arrest him. Because the officers searched Ware only after confirming that he discharged a firearm in St. Paul, this search was incident to a lawful arrest. We therefore conclude that, because the officers had a reasonable, articulable suspicion to stop Ware initially and within moments developed probable cause to arrest him and to search him incident to that arrest, the district court did not err when it denied Ware's motion to suppress evidence.

9

**II.** **The district court did not abuse its discretion when it denied Ware's motion for a downward dispositional departure from the statutory-minimum sentence.**

Ware asserts that the district court should have exercised its discretion to grant his motion for a downward dispositional departure from the statutory-minimum sentence imposed under Minn. Stat. § 609.11, subd. 5(b) (2020), because he presented substantial and compelling circumstances that permit a departure pursuant to the Minnesota Sentencing Guidelines and *State v. Soto*, 855 N.W.2d 303, 310 (Minn. 2014). The state responds that the district court needed only to consider Ware's information but was not obligated to use its discretion to grant the motion. Although the district court considered statements from Ware and his attorney and a letter from the behavioral-health program Ware attended, it denied the motion, sentencing Ware to the statutory-minimum 60-month prison sentence.

The Minnesota Sentencing Guidelines require a district court to impose a sentence within the presumptive range "unless there exist identifiable, substantial, and compelling circumstances to support a departure." Minn. Sent'g Guidelines 2.D.1 (2020). "Because the guidelines' goal is to create uniformity in sentencing, departures are justified only in exceptional cases." *State v. Solberg*, 882 N.W.2d 618, 625 (Minn. 2016). We review the district court's decision on a departure request for an abuse of discretion; without clear evidence of abuse, we will not overturn the district court's decision. *See State v. Givens*, 544 N.W.2d 774, 776 (Minn. 1996) ("This court is loath[] to overturn the exercise of that discretion without clear evidence of its abuse."). "Only the rare case will merit reversal based on the district court's refusal to depart." *State v. Johnson*, 831 N.W.2d 917, 925

10

(Minn. App. 2013) (quotation omitted), *rev. denied* (Minn. Sept. 17, 2013). So long as the district court considered all the testimony and information presented, the court of appeals will affirm the district court's decision, and the district court does not need to explain its reasons for imposing the presumptive sentence. *State v. Van Ruler*, 378 N.W.2d 77, 80-81 (Minn. App. 1985).

The Minnesota Sentencing Guidelines permit the district court to consider whether a person is "particularly amenable to probation" when deciding the sentence to impose. Minn. Sent'g Guidelines 2.D.3.a(7) (2020). Particular amenability to probation can be demonstrated by such factors as the defendant's age, prior record, remorse, cooperation, attitude while in court, and the support of friends and family. *State v. Trog*, 323 N.W.2d 28, 31 (Minn. 1982). The district court may also consider anything else that may be relevant. *Soto*, 855 N.W.2d at 310.

Here, the district court considered the testimony and information Ware and his attorney provided, and the district court acted within its broad discretion when it decided not to grant Ware's dispositional-departure motion.

**Affirmed.**

11