**STATE of Minnesota, Respondent,**

v.

**Michael Ray GARNER, Appellant.**

**No. 49975.**

Supreme Court of Minnesota.

July 3, 1980.

C. Paul Jones, Public Defender, and Mark F. Anderson, Deputy Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Alan L. Mitchell, County Atty., Duluth, Brian D. Simonson, Asst. County Atty., Hibbing, for respondent.

Heard before OTIS, ROGOSHESKE, and TODD, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

Defendant, Michael Ray Garner, was found guilty by a jury of uttering a forged check in violation of Minn.Stat. § 609.625, subd. 3 (1978),[1] and was sentenced to 10

---

1. Minn.Stat. § 609.625, subd. 3 (1978), provides: "Whoever, with intent to defraud, utters

or possesses with intent to utter any forged writing * * * knowing it to have been so

years. On appeal, he asserts that the trial court erred in admitting into evidence a written confession he gave to the police. We conclude that the police coerced the defendant into confessing by using improper interrogation techniques and, accordingly, we reverse.

On September 11, 1978, at about 5 p. m. defendant attempted to cash a check that had been stolen from the West End Iron and Metal Company of Duluth at the Lake Aire Bottle Shop, also in Duluth. The check was made out to "Ray Hanson" and was signed on behalf of West End Iron and Metal Company by "J. B. Davis." [2] Because an hour earlier Duluth area merchants had been warned through a check alert system to watch for the stolen checks, the clerk at Lake Aire noticed that the check was among those listed as being stolen and notified the assistant manager of the store. The assistant manager asked defendant for identification, and he produced a draft card in the name of Ray Hanson. The assistant manager then called the police, who came, arrested defendant, and took him to police headquarters.

At police headquarters, defendant, who had been drinking,[3] was interrogated by an officer from the detective bureau. When the officer entered the interviewing room, he recognized defendant as his former paperboy and greeted him by name (Michael Garner). Defendant then replied, presumably because he realized he could no longer assert that he was Ray Hanson, "it was worth a try" or "it was worth a chance."

The officer testified that he began the interrogation by explaining to defendant that the charge would be uttering a forged check and told him there would be no problem with identification since he had been photographed in the store. At this point, the officer received a phone call from an informant stating that there was a gun in the car allegedly used by defendant. A gun was found in the car,[4] which remained in the Lake Aire parking lot following defendant's arrest, and the officer, thinking he was lying to defendant, told him that it was against the law for a convicted felon to possess a gun.[5] The officer then informed defendant of his *Miranda* rights and proceeded to question him.

The officer testified that he had been trained by the FBI in the use of stress-inducing techniques [6] and admitted that he and other officers often used such techniques coupled with trickery and deceit in an effort to frighten defendants into giving incriminating statements. The officer readily explained how these techniques were used against defendant in this case:

> I explained to [defendant] that there were a strong possibility that if we did not get a truthful statement from him that I would attempt to charge him with everything I possibly could. My exact words were, "I'm going to load you up with so much that you're going to be round shouldered." This was an attempt to put stress on the defendant.

The officer also said he used the stress-inducing technique of violating defendant's

---

forged, may be sentenced as provided in subdivision 1."

2. No person with the name of "J. B. Davis" was employed by West End or was authorized to sign checks on its behalf. A West End employee did testify, however, that a "Y. B. Davis" did work for West End and was an authorized signer on West End checks.

3. A breathalizer test taken by defendant after his interrogation revealed a blood alcohol level of .14%.

4. The car in which the gun was found was not registered in defendant's name. The only evidence linking the car to defendant was a hear-

say report of a car driven by someone who had attempted to pass a check at another liquor store in the area.

5. The defendant, unknown to the officer, did have a prior felony conviction and, despite the officer's belief that he was lying to defendant, he was correct in stating that it was unlawful for defendant to possess a firearm. Minn.Stat. § 624.713, subd. 1(b) (1978).

6. We note, however, that current FBI procedures specifically prohibit the use of such techniques during interrogation. Federal Bureau of Investigation Special Agents Legal Handbook, § 7–2.2, 2.3 (1978).

body space by placing him in a chair that did not move and then approaching him during interrogation until he was almost touching him. After being interrogated in this manner, defendant gave a written confession to another officer which was admitted over defendant's objection at trial. Defendant did not testify at his trial.

■ Beginning with the detailed discussion of police interrogation techniques in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), our judicial system has given explicit recognition to the inherently coercive atmosphere that encompasses an in-custody defendant subjected to police interrogation by adopting procedural safeguards that ensure that such a defendant will be fully apprised of his constitutional rights and allowed to assert them. Accordingly, we, along with other courts, have repeatedly admonished the police against extracting inculpatory statements from defendants by any sort of threat, violence or promises. *E. g., State v. Orscanin*, 283 N.W.2d 897 (Minn.1979). We are truly dismayed, therefore, by the conduct of the interrogating officer in this case. The officer freely admitted that he intentionally lied to defendant and put stress on him by threatening to charge him with as many crimes as possible and by physically approaching him in an intimidating way. Moreover, because defendant was intoxicated, his susceptibility to such techniques was increased. We recognize that solution of crimes is an arduous task and that interrogation of suspects is an essential tool of law enforcement; the techniques used in this case, however, clearly exceed the bounds of responsible law enforcement and are obviously designed to extort confessions from defendants rather than seek the truth. Given the unfair and coercive context of the officer's interrogation, defendant understandably chose to sign the written confessions. We condemn this type of interro-

gation and hold that the confession was not, as required by the 14th amendment, a voluntary product of free and unconstrained will, was inadmissible, and should have been suppressed.[7]

The state contends that, even if defendant's confession was improperly admitted into evidence, the error was harmless beyond a reasonable doubt because of other overwhelming evidence of defendant's guilt. We doubt, however, that there was no prejudice to defendant by the improper admission of his confession. While there was substantial independent evidence of defendant's guilt, the confession stood unrebutted as an admission of his guilt since he did not testify in his own behalf. Moreover, the confession contained evidence as to where defendant obtained the check, that it was purchased for 20% of its face value, and that he tried to pass it at another store before going to Lake Aire. Since defendant did not forge the payee's endorsement to the check before he was arrested, this unrebutted evidence persuasively established that defendant knew the instrument was forged and that he intended to utter it, both essential elements of the offense.

■ Resolution of this case should not depend, however, on whether defendant was prejudiced by the improper introduction of his confession. Incriminating statements produced by coercion are untrustworthy and, more importantly, blatantly inconsistent with fundamental concepts of due process. *Smith v. Estelle*, 527 F.2d 430, 431 (5th Cir. 1976). Accordingly, it is well established that the erroneous admission of a coerced confession is not subject to the harmless-error rule. *Chapman v. California*, 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 828 n. 8, 17 L.Ed.2d 705 (1967); *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). Thus, we hold that defendant's

---

7. We are equally distressed by the prosecutor's judgment in introducing into evidence defendant's confession, in view of the substantial evidence aside from the confession that established defendant's guilt. We note that ABA Standards for Criminal Justice, The Prosecution Function and the Defense Function § 5.6(b)

(Approved Draft, 1971) admonishes prosecutors against using such evidence. The commentary to § 5.6(b) states that the prosecutor "should avoid jeopardizing a strong case by introducing evidence which is essentially cumulative but which may bring about a reversal."

coerced confession was improperly admitted into evidence and the harmless-error rule may not justifiably be applied to uphold the conviction, despite arguably overwhelming evidence of guilt.

Reversed and new trial granted.