409 N.W.2d 857 (1987)
STATE of Minnesota, Respondent,
v.
C.J.M., Appellant.
No. C4-86-1763.
Court of Appeals of Minnesota.
July 21, 1987.
Review Denied September 18, 1987.
*858 Hubert H. Humphrey III, State Atty. Gen., St. Paul, Robert F. Carolan, Dakota Co. Atty., Mark Nathan Lystig, Asst. Co. Atty., Hastings, for respondent.
C. Paul Jones, State Public Defender, Marie L. Wolf, Asst. Public Defender, Minneapolis, for appellant.
Considered and decided by POPOVICH, C.J., and WOZNIAK and LESLIE, JJ., with oral argument waived.

OPINION
WOZNIAK, Judge.
C.J.M. appeals from the judgment of conviction and sentencing on charges of criminal sexual conduct in the first degree and intrafamilial sexual conduct in the third degree, sentencing him to 140 months in custody to run concurrently with his previous sentences for unrelated burglary charges. We affirm as modified.

FACTS
LMM, appellant's sister, alleged that on a Friday or Saturday night in late February 1985, she was raped by appellant. She was alone in the house sleeping in her bedroom when appellant, then 19 years of age and living outside the family home, burst into her bedroom demanding money for liquor. She refused and got out of bed to run out of her bedroom. He was drunk, and she was frightened of him. He grabbed her by the arms and threw her to the floor. He unbuttoned her pajamas and, while holding her arms, forced her to have sexual intercourse. Appellant told her he would kill her if she told their mother. Later that evening, LMM's mother and stepfather came home, but appellant had left the house. She did not tell anyone of the incident at that time.
About six months later, LMM went to a medical clinic where a nurse practitioner informed her that she was approximately six months pregnant. LMM began to cry and told the nurse practitioner it must be her brother. She alleged that she had not had another sexual relationship except for her brother.
When LMM returned home, she told her mother that her brother had raped her, caused her pregnancy, and she wanted an immediate abortion. The next day, LMM traveled with her family to Wichita, Kansas and obtained an abortion. No blood testing was done to determine paternity.
Initially, her mother was very supportive of LMM and her decision to have an abortion. A few months later, however, when LMM decided to press charges against appellant, her mother became angry with her. Her mother stated at the trial that she believed that LMM's boyfriend was the father. LMM had been dating her boyfriend around the time of the alleged rape.
*859 After the abortion, LMM was fired from her part-time job at a nursing home because she had missed work without notifying her employer. She went to see Barb Starr, a teacher and work experience coordinator for Apple Valley High School. LMM gave Starr a note indicating she had become pregnant as a result of her brother forcing himself on her. She asked Starr to keep the information confidential, but help her get rehired. LMM gave Starr the information to show her absence from work was not her fault. Later Starr learned she was legally obligated to report the incident. Starr then reported the incident to a social worker with Dakota County Human Services in the Child Protection Division. The social worker contacted the Burnsville Police Department.
On September 25, 1985, Officer Holden and the social worker interviewed LMM. She told them that she had been raped by her brother in late February 1985, that her brother did not know about the pregnancy, and that she did not want him to be contacted.
On November 5, 1985, Holden interviewed LMM again and taped her statement. In that statement, LMM told Holden she was sure the incident happened on Friday. Officer Holden and LMM also discussed the incident informally at her home a number of times. In all these conversations, LMM stated that the incident which had occurred in February 1985 was the only time in which she had a sexual relationship with her brother.
In February 1986, LMM changed her statement. She told Holden that appellant first raped her when she was 13 and he had been raping her once or twice a week since that time. At trial she also stated appellant had raped her once or twice a week from the time she was 13 until she was in 10th or 11th grade, and she did not know why she had not told the police about these earlier incidents at first.
Prior to trial, appellant was incarcerated on unrelated charges. During this time, Holden interviewed him. After reading the Miranda rights, Holden incorrectly stated that blood tests proved appellant fathered the unborn child and that there were witnesses to the rape. Appellant began making incriminating statements, stating he had been drunk and using cocaine from November 1984 until June 1985, and did not remember that period of time. Appellant also stated he had been in Jacksonville, Florida, during the month of February in 1985, returning to Minnesota on February 27 or 28. Appellant remembered that he was living with his grandmother in Minneapolis, but went out to Burnsville in early March 1985 to party with two of his friends. Appellant then said he wanted a lawyer and ended the conversation.
After trial, the jury found appellant guilty of first degree sexual conduct and third degree intrafamilial sexual abuse.
The trial court gave credit for jail time served from the conviction date of June 19, 1986, but refused to give credit from the time of the complaint on December 19, 1985, because appellant had been incarcerated on other unrelated charges.

ISSUES
1. Was the evidence sufficient to support the convictions for first degree criminal sexual conduct and third degree intrafamilial sexual abuse?
2. Did the trial court err in refusing to award appellant credit for incarceration from the time the complaint was filed even though he was incarcerated on unrelated charges?
3. Did the trial court err in admitting appellant's statements to a police officer?
4. Was appellant denied his right to effective assistance of counsel?

ANALYSIS
The conviction must be affirmed if a jury could reasonably conclude that the defendant was guilty. State v. Merrill, 274 N.W.2d 99, 111 (Minn.1978). It is the exclusive function of the jury to weigh the credibility of witnesses in a criminal trial. State v. Blair, 402 N.W.2d 154, 158 (Minn. Ct.App.1987).
*860 1. A conviction for criminal sexual conduct in the first degree requires proof that the defendant engaged in sexual penetration, caused personal injury to complainant, and used force or coercion to accomplish sexual penetration. Minn.Stat. § 609.342, subd. 1(e)(i) (Supp.1985).
Personal injury means "bodily harm" or "severe mental anguish or pregnancy." Id. § 609.341, subd. 8 (1984). Force is defined as
the infliction, attempted infliction, or threatened infliction by the actor of bodily harm or commission or threat of any other crime by the actor against the complainant or another, which causes the complainant to reasonably believe that the actor has the present ability to execute the threat, and also causes the complainant to submit.
Id., subd. 3. Coercion means "words or circumstances that cause the complainant reasonably to fear that the actor will inflict bodily harm upon * * * the complainant or another." Id., subd. 14.
Appellant argues insufficient evidence supported the conviction for criminal sexual conduct because the State failed to prove the sexual contact was instigated by force or that appellant was responsible for LMM's pregnancy.
Regarding the element of force, LMM testified that appellant threw her to the floor and held her arms while he raped her. Further, there was a threat of future force when he told her he would kill her if she told their mother.
Regarding the pregnancy, LMM testified that appellant was the only person with whom she had had sex. Appellant questioned LMM's credibility because she stated in a taped statement that the rape definitely occurred on a Friday. At trial, she stated she was uncertain whether the rape occurred on a Friday or Saturday. She did remember the rape occurred on a weekend evening because her mother and stepfather were out. Her younger brother and cousin were spending the night at a friend's house. Appellant argues that he was in Florida until February 27 or 28, a Wednesday and Thursday, so he could not have raped his sister on a Friday or Saturday in late February. Although one of appellant's friends testified that appellant was in Florida until early March, another friend testified that appellant returned to Minnesota in mid-February. Further, appellant admitted that he came out to Burnsville (from his grandmother's house in Minneapolis) on a weekend in early March to party with his friends.
Appellant also questions LMM's credibility because her allegations aided her in regaining her job, implying that she made up the allegations so that Starr would help her get rehired. Even before she lost her job, however, LMM told the nurse practitioner at the clinic that her brother was the father.
Appellant's credibility was also challenged. For example, at trial he stated that his previous criminal history arose from events occurring only on one day. In fact, the events occurred on two days. He also made other statements which were suspect, but not directly proven to be false.
In Ahiagbede, in which a 13-year-old accused her stepfather of first and second degree intrafamilial sexual abuse, this court stated:
We must assume the jury believed R.C. when she described numerous acts of sexual contact and penetration perpetrated by appellant. Her testimony alone established every element of the charged offenses. The law does not require corroboration of testimony by the victim of a sex offense. Where the testimony is conflicting, the jury is entitled to believe the complainant's version of the facts.
State v. Ahiagbede, 394 N.W.2d 187, 189 (Minn.Ct.App.1986) (citations and footnote omitted).
This case also rests on LMM's and appellant's credibility. The jury believed LMM's testimony. Her testimony alleged every element of the offenses, and it was within the jury's purview to find as it did.
2. Appellant was sentenced on August 21, 1986 to 140 months, the high range of a presumptive term for a severity level VIII offense with a criminal history score of 6 *861 or more. The sentence ran concurrently with appellant's previous burglary convictions. The court gave appellant credit for time served since June 19, 1986, the date of appellant's conviction. It declined to give appellant credit for the time from December 19, 1985, the date the complaint was filed.
In State v. Zaycheck, the defendant, already incarcerated in state prison, had been charged with receiving stolen property and theft, sentence to run concurrently with the previous sentence. Zaycheck was not granted jail credit for time spent in prison prior to sentencing. The Zaycheck court cited the rule that a defendant is entitled to jail credit for "all time spent in custody in connection with the offense or behavioral incident for which sentence is imposed." State v. Zaycheck, 386 N.W.2d 294, 295-96 (Minn.Ct.App.1986) (quoting Minn.R.Crim.P. 27.03, subd. 4(B)). In considering the question of whether the second conviction and sentence was "in connection with" the first conviction, this court stated:
Zaycheck was readily available to Ramsey County authorities from the date he was charged. They knew he was at Stillwater and would not be leaving until June 1986. To a great extent the State had control over the length of time that would elapse between charging and sentencing on the theft offense. The trial court ordered that Zaycheck's sentence be served concurrently with the sentence he was then serving in Stillwater. The court's order conformed with the sentencing guidelines. The trial court did not articulate any factors that would justify a departure. Under the circumstances here, it is unfair to deny jail credit to Zaycheck.
To do so would be to impose a de facto consecutive sentence upon him to the extent that there was any delay in the proceedings on the theft charge.
Id. at 296.
The Zaycheck factors exist in this case. The State authorities knew appellant was in the Hennepin County Jail. The State had control over the length of time between charging and sentencing (there were three continuances, two requested by the State). The trial court applied the guidelines in ordering that the sentences be served concurrently. Not to allow credit for the time served from the date of the complaint is a de facto departure from the guidelines, and the trial court did not list factors justifying departure from the guidelines. Accordingly, we modify the trial court's decision to allow, in addition to the credit allowed by the trial court, credit for time served from the date of the complaint on December 19, 1986.
3. Appellant argues his statement to the police was unconstitutional and inadmissible because the State failed to prove it was voluntarily made, or that he knowingly and intelligently waived his constitutional rights.
During an interview session, after giving the Miranda warning, Officer Holden had told appellant that blood tests proved that he had impregnated his sister and that there were witnesses to the attack. These statements were false because there were no blood tests nor witnesses. Appellant argues his responsive statements were inadmissible because Officer Holden deceived him in that interview.
In State v. Garner, 294 N.W.2d 725 (Minn.1980), an interrogating officer used FBI stress-inducing techniques, such as violating defendant's body space, coupled with trickery and deceit to frighten defendant into giving incriminating statements. Id. at 726-27. The supreme court held that intentional lies, together with the stress-inducing techniques of physically intimidating defendant, rendered the coerced confession inadmissible, and reversed despite overwhelming evidence of guilt. Id. at 727.
While Officer Holden in this case told deliberate lies to appellant, his conduct did not amount to the intimidating conduct of the Garner officer; however, we strongly condemn such tactics and suggest that, in the future, we will reexamine a conviction based upon the sole ground of dishonesty, without the additional factor of coercive interview techniques.
*862 4. Appellant argues that he was denied his constitutional right to effective assistance of counsel. The presumption is that defendant has received effective representation and the burden is on the defendant to point out specific errors in counsel's actual performance. United States v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984).
Appellant points to two errors. First, he states his attorney erred in failing to call LMM's twin sister, who had made a statement to police in which she accused her uncles of sexually abusing her as a child. Appellant alleges that, because she was not called as a witness, the jury did not hear how she might have influenced LMM's testimony. LMM knew, however, about her twin sister's alleged sexual abuse prior to giving her statement to the police, so her sister's statement could not have influenced LMM's allegations about her rape. Further, her sister's statement was family background information and irrelevant to LMM's claim that appellant raped her.
Second, appellant argues that his lawyer failed to have the trial continued until his uncle was available to testify and corroborate appellant's trip to Florida. The State maintains that appellant never mentioned the existence of the uncle before he testified at trial. The trial court found that appellant failed to show witness unavailability necessitated continuance.

DECISION
We affirm as modified, granting credit for jail time served since the date of the complaint.
Affirmed as modified.