STATE of Minnesota, Respondent,

v.

Jason Ryan WILLIAMS, Appellant.

No. C7–94–782.

Supreme Court of Minnesota.

July 14, 1995.

John M. Stuart, State Public Defender, Susan K. Maki, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Donna J. Wolfson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

ANDERSON, Justice.

Defendant, Jason Ryan Williams, aged 16, was referred for prosecution as an adult on charges arising from his involvement in a double homicide and an attempted homicide. Williams was indicted on seven counts, including two counts of first-degree murder, two alternate counts of first-degree murder, two alternate counts of first-degree attempted murder, and one count of first-degree burglary. A jury convicted Williams on all seven counts.

Williams appeals from the judgment of conviction, claiming that the trial court prejudicially erred in admitting evidence of a confession that he made while in custody. Williams maintains that this confession was obtained in violation of his Fifth Amendment privilege against self-incrimination and his Fourteenth Amendment due process rights. Williams further maintains that his confession should have been excluded from evidence because the interrogating officers failed to tape record his entire interrogation. Williams also claims that the trial court prejudicially erred in admitting evidence of inculpatory statements that he made while being held at the Juvenile Detention Center. Williams maintains that these statements should have been excluded from evidence as a matter of fundamental fairness. We hold that Williams's confession and his inculpatory statements were properly admitted into evidence, and we affirm.

On the evening of October 12, 1992, Michael Hage returned from work to his home in Brooklyn Park, Minnesota. Upon arriving home, Hage discovered his wife, Julie Hage, dead from various injuries, including one shotgun blast to the back of her head and another shotgun blast to her lower back. He also discovered his three-year-old daughter, Nicole, dead from being stabbed with a knife. His four-year-old son, Mathew, had also been stabbed, but was still alive and survived due to medical treatment. Before being taken to the hospital, Mathew remained conscious long enough to answer some questions. When asked if he had seen his assailant, Mathew responded that a black man had hurt him. Several items of personal property had been stolen from the Hage residence, including a 1992 Hyundai Sonata automobile.

Later that evening, at approximately 10:15 p.m., a police patrol officer identified the Hages's 1992 Hyundai Sonata being driven in Champlin, Minnesota. The driver of the Hyundai was ordered to pull the car to the side of the road and to stop. Several police squad cars arrived at the scene. Using aggressive felony arrest maneuvers, the police arrested the car's five occupants: Ray Turner, who was driving, Williams, who was sitting in the front passenger seat, Wendy Cox, Victoria (Tory) Dorkins, and Michael Anthony Nehmzow. All five of the occupants

were arrested, handcuffed and transported by squad car to the Brooklyn Park police department for questioning.

Sergeant James Penaz drove Williams, a black male aged 16, to the police department. During the drive, Williams asked Penaz why he had been arrested. Penaz answered that he had been arrested for "being in and/or driving a stolen vehicle." Penaz did not mention the homicide investigation. Williams then reportedly told Penaz, "we picked up Wendy, Tory and Mike later. They had nothing to do with it."

Upon arriving at the police department, Williams was booked, and Officer Jonathan Wilson conducted a property inventory and performed a medical screening. During the medical screening, Officer Wilson bandaged Williams's right hand, the palm of which had been cut. At 10:45 p.m., Williams was placed alone in a detention cell. Williams's detention cell contained a bed, which was bolted to the wall, a toilet, and a sink with running water.

At approximately the same time Williams was placed in his detention cell, Brooklyn Park police detectives Robert Bozovsky and Harry Christensen attended an update meeting at the police department to learn what details had already been discovered by the homicide investigation. After the meeting, the detectives interviewed three persons, in the following order: Victoria Dorkins and Mike Nehmzow, who were both arrested occupants of the Hages's car, and Josh Jones, who had been arrested later and brought to the station. From these interviews, which lasted until approximately 5:00 a.m., October 13, 1992, the two detectives learned that Williams had told the occupants of the Hages's car that he had stolen the car and that he had cut his hand while shooting a shotgun.

During this six-hour period, Williams remained alone in his detention cell. Williams did not ask for or use the telephone, did not have visitors, did not watch television, and did not listen to music. During several routine security checks, Williams was observed lying on his bed with his eyes closed. At approximately 1:12 a.m., Officer Wilson rebandaged Williams's hand. At approximately 5:02 a.m., Officer Wilson allowed Williams

to use the asthma inhaler that Wilson had confiscated from Williams during the property inventory.

At approximately 5:20 a.m., Williams was taken from his detention cell to an interview room located across the hall. The interview room measured 10 feet, 8 inches long by 7 feet, 5 inches wide. The room had no exterior windows. Two banks of lights, each containing three 48-inch tube fluorescent bulbs, illuminated the room's only furniture: one table, measuring 48 inches long by 30 inches wide, and three chairs.

Detectives Bozovsky and Christensen were waiting in the interview room when Williams arrived. They introduced themselves and sat at opposite ends of the table, while Williams sat between them with his back to the door. Although the police did not test Williams's blood-alcohol level, Williams reportedly walked without difficulty, did not smell of alcohol, and spoke clearly without slurring. Williams was not wearing handcuffs.

After Williams sat down, Detective Bozovsky orally recited a full *Miranda* warning and asked Williams if he understood the rights of which he had just been advised. Williams responded affirmatively. Bozovsky then asked Williams if he was willing to talk with them. Williams responded that he was willing to talk.

Williams had not yet been informed about the homicide investigation. Instead, he was questioned about being in a stolen car. Williams initially maintained that he had stolen the car from a black man who had left the keys in its ignition while parked outside of a south Minneapolis liquor store. Responding to preliminary questions, Williams told the detectives his mother had kicked him out of the house, he did not know her phone number, and he had not seen his father in a long time. Williams reported that he had been staying with friends, and he reported staying with a friend at an address on Park Avenue in Anoka, Minnesota, the night before. Later, in a car parked at that address, police found a sawed-off shotgun, wrapped in a plaid bloodstained shirt.

Approximately 45 minutes into the interview, Detective Bozovsky informed Williams

that the car he had been riding in had been stolen from the home of people who had been murdered. Bozovsky stated that he suspected Williams had injured his hand during the murders. Bozovsky next said that he wanted Williams's side of the story because if he didn't explain "how it happened people would believe the worst about what had happened * * *." Williams denied any involvement in the homicides. When Detective Christensen explained that the homicide scene would be processed for fingerprints and blood analysis, Williams responded that neither his fingerprints nor his blood would be found at the homicide scene.

Detective Christensen continued to hypothesize about the homicides and explained to Williams that if the adult female victim had been sexually assaulted, physical evidence, such as semen, could be traced back to the assailant. Williams emphatically denied that anything like that had happened, and Christensen accused him of lying. Williams then lost his composure, stood up from his chair, turned towards Christensen and said, "I don't have to take any more of your bullshit." Then Williams walked out of the interrogation room, into the hall, and back to his detention cell, where he was placed by the detention officer. This episode occurred approximately one hour into the interview. Williams never said that he wanted to stop answering questions. Christensen testified that he was shocked by Williams's behavior because, in over 17 years of police experience, a suspect had never stood up and simply walked out of the interview room. Christensen interpreted Williams's behavior to be a "temper tantrum."

To allow Williams some time to "cool off," Detectives Christensen and Bozovsky left the detention center area of the police department. After a few minutes, another officer informed them that Mathew Hage was being treated at the hospital and was expected to survive. After discussing the status of the interrogation, the two detectives decided to return to Williams's detention cell. On cross-examination at the Rasmussen hearing, Christensen explained that he and Bozovsky could not know whether Williams wanted to talk with them "unless we went back in and informed him of [the] new development in the case."

Approximately five minutes after leaving the detention center area, Detective Bozovsky entered Williams's detention cell. Bozovsky, who "never got the impression [Williams] didn't want to talk to me," sat down next to Williams, who was calmly lying on his bed. Detective Christensen did not enter the cell, because Williams's earlier behavior indicated that he was angry at Christensen for calling him a liar. Instead, Christensen stood on the door threshold, attempting to avoid creating hostility towards Williams.

Detective Bozovsky informed Williams that Mathew was expected to survive. Bozovsky then told Williams that Mathew would be able to identify him, an assertion that Bozovsky admitted was "pure speculation." Bozovsky then asked Williams if he would like to tell his side of the story. At that point, Williams nodded affirmatively, and while tears welled up in his eyes, he admitted that he had been in the house. Detective Christensen then entered Williams's cell and, in an attempt to comfort Williams, addressed Williams in a calm, soft tone, "You understand that I was just doing my job." Williams nodded that he understood and shook hands with Christensen. Bozovsky then asked Williams whether he wanted to talk with them further in the detention cell or whether he wanted to return to the interview room. Williams chose to return to the interview room.

Williams and the two detectives returned to the same interview room they had previously been in and resumed their prior seating arrangements. Williams had regained his composure, and Bozovsky fully advised him of his *Miranda* rights for the second time. Williams again said he understood his rights, and when the detectives asked whether he was willing to talk with them, Williams responded affirmatively.

During the first half hour of the ultimately hour-long interview, Williams told the detectives his version of what occurred at the Hage residence. The detectives did not tape record this conversation, explaining at trial that their normal procedure was to begin

taping only once the suspect was willing to give a statement. Williams then agreed to repeat his detailed confession so that the detectives could record it. At the beginning of this tape recorded confession, Detective Bozovsky fully advised Williams of his *Miranda* rights for the third time, and Williams again replied that he understood his rights and was willing to talk.

Although no one told Williams that he had the right to have a parent or guardian present, at no time during the two-hour questioning period did Williams request to speak with a lawyer, parent, or guardian. Also, Williams never asked for anything to eat or drink and never complained about experiencing pain in his bandaged hand.

The interview ended at approximately 7:28 a.m., October 13, 1992. Williams was returned to his cell and was later taken to North Memorial Hospital to have a physician examine his hand. Ultimately, Williams was taken to the Hennepin County Juvenile Detention Center. Later in the afternoon that same day, Detectives Bozovsky and Christensen met with Williams at the Juvenile Detention Center to provide Williams with a transcribed copy of his taped confession. Williams read the heading, the first question and the first answer out loud, demonstrating his literacy. Williams then read the entire 19–page statement, marking six corrections and initialling them with a pen. Williams signed the confession, and after the trial court denied his motion to suppress the confession, it was admitted into evidence against him at trial.

During his stay at the Juvenile Detention Center, Williams made other incriminating statements that were also admitted at trial. Juvenile Detention Center employee Mark Wilson testified that he knew Williams from prior contacts outside of the Center setting. When Wilson saw Williams at the Center on October 15, 1992, Wilson asked Williams where he had been since Wilson had last seen him. Williams answered he had been at various places, and then smiled and "without hesitation he says 'And now I'm going to St. Cloud.'" Wilson then told Williams, "You don't know that, man." To which Williams replied, "Hey man, I killed two people, where

do you think I'm going to go?" When Wilson asked him how he could say that while smiling, Williams answered, "Because if I don't smile I'll cry because I know it's dumb."

Juvenile Detention Center employee Steen Erickson testified that he had been with Williams in the Center's gym on November 9, 1992. Because of his injured hand, a medical activity restriction had been placed on Williams, and Williams was sitting on the sidelines watching a recreational activity. At Williams's request, Erickson escorted him back to his room. On the way, Williams expressed frustration with his medical restriction. Erickson explained why the restriction had been imposed and asked Williams what was wrong with his hand. Williams explained that he had injured his hand on the stock of a gun that had been sawed off. Erickson had not asked Williams how he had injured his hand.

Finally, Juvenile Detention Center employee Marilyn Peichel, who had the ability to monitor the conversations of Center residents through a speaker monitoring system, testified that she had overheard Williams speaking through the air vents to another resident. Peichel testified that she heard Williams say, "The only person that had any heart was the mother, she's the only one that wanted to fight me when I had the gun and the other ones were chicken, they had no heart."

## I.

When an accused suspect invokes the right to remain silent, custodial interrogation must cease. *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966). In response to Detective Christensen's accusation that he was lying about his involvement in the homicides, Williams stood up from his chair, turned towards Christensen, said "I don't have to take any more of your bullshit," and walked out of the interview room. By this behavior, Williams claims that he invoked his right to remain silent while being questioned at the police department. Williams further claims that the interrogating officers failed to scrupulously honor his invocation because they returned to question him only five minutes

after his invocation. Because the detectives failed to scrupulously honor his invocation, Williams claims that his resulting confession should have been excluded from evidence. Before analyzing whether the detectives scrupulously honored Williams's invocation of his right to remain silent, we must first determine whether he effectively invoked his right to remain silent.

In the right to counsel context, we note that generally the police and the court must examine the language used by a defendant in determining whether a defendant has attempted to invoke the right to counsel.[1] It is difficult to imagine what behavior a defendant could use to clearly convey the desire to speak with counsel. In contrast, a suspect can attempt to convey a desire to remain silent in various ways that do not necessarily require that words be used at all. Thus, we must define the appropriate scope of our inquiry into whether the suspect has invoked the right to remain silent.

A suspect's hostile behavior during custodial interrogation might be in response to a number of stimuli. It can express everything from physical discomfort to reluctance to talk. Without oral explanation, it is often ambiguous as to what message a suspect's behavior is intended to convey. Therefore, before it can be said that a suspect has unequivocally and unambiguously invoked the right to remain silent, we hesitate to go beyond the language used by the suspect to examine the behavior of the suspect.

Conceivably, many criminal suspects act in a hostile manner towards their interrogators. Thus, a rule allowing a suspect's hostility to be sufficient to unambiguously invoke the right to remain silent would unreasonably impede law enforcement efforts. The suspect's hostile behavior would impose a barrier to police questioning in numerous cases.

That approach fails to strike an appropriate balance between the state's interest in obtaining confessions from criminals and the suspect's interest in not being compelled to incriminate himself. We decline to adopt such an approach. Thus, to unambiguously invoke the right to remain silent, we conclude that a suspect's hostile behavior, standing alone, is ordinarily insufficient, and we conclude that the language used by the suspect must sufficiently articulate the desire to remain silent. To hold otherwise would encourage judicial second-guessing of police officers as to the meaning of a suspect's actions.

This court's decision in *State v. O'Neill* neither undermines this rule nor compels the conclusion that Williams effectively invoked his right to remain silent. 299 Minn. 60, 216 N.W.2d 822 (1974). In *O'Neill*, this court held that the defendant had invoked his right to remain silent when detectives attempted to interview him. *Id.* Two detectives went to the Juvenile Detention Center to interview the 17–year–old defendant. *Id.* at 61–62, 216 N.W.2d at 824–25. The detectives identified themselves, informed the defendant he was a murder suspect, and advised the defendant of his *Miranda* rights. *Id.* at 62, 216 N.W.2d at 825. From the outset, immediately following the introduction of the detectives, the defendant in *O'Neill* became "very wild and upset." *Id.* The defendant exhibited a general hostile refusal to answer any of the questions the detectives wanted to ask. The defendant stated that the last time he had cooperated with police, he had ended up in jail, and he began threatening the detectives. *Id.* Because the defendant generally refused to answer any questions from the outset, this court held that the defendant's uncooperative behavior and abusive language towards the detectives "must be interpreted as an indica-

---

1. *See, e.g., State v. Hale*, 453 N.W.2d 704, 708 (Minn.1990) (holding that defendant's "fleeting, off-hand comment in mid-sentence about his future need for a good attorney * * * was not even arguably an invocation of his *Miranda* right to counsel"), *reh'g denied* (Minn., May 23, 1990); *State v. Campbell*, 367 N.W.2d 454, 459 (Minn. 1985) (evaluating whether defendant's statement "if I'm going to be charged with murder maybe I should talk to an attorney," was sufficient to

invoke right to counsel); *cf. State v. Scales*, 518 N.W.2d 587 (Minn.1994) (requiring custodial interrogations conducted at the police station to be recorded in their entirety based in part on the rationale that many factual disputes regarding the denial of a defendant's constitutional rights would be avoided if the conversations between the police and an accused suspect were recorded), *reh'g denied* (Minn., Aug. 22, 1994).

tion that he did not wish to talk." *Id.* at 70–71, 216 N.W.2d at 829.

The circumstances surrounding Williams's purported invocation of his right to remain silent are significantly different from the circumstances found in *O'Neill.* Williams never said that he wanted to stop answering questions. In addition, Williams never exhibited a general refusal to answer any of the questions the detectives wanted to ask. Instead, he expressed insult when Detective Christensen accused him of lying. Although we recognize that a suspect who answers some questions does not thereby deprive himself of the right to refrain from answering other questions, *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28, we conclude, as did the trial court, that Williams's hostile response to Christensen's specific accusation, occurring after approximately one hour of questioning, does not constitute an unequivocal and unambiguous invocation of his right to remain silent.

Indeed, the detectives testified that Williams was apparently angry at only Detective Christensen because Christensen had called him a liar; but Detective Bozovsky "never got the impression he didn't want to talk to me." [2] Christensen explained that he and Bozovsky could not know whether Williams wanted to talk with them unless they went back into Williams's detention cell and informed him of the new development in the case. As is often the case when behavior lacks lucid oral explanation, any desire by Williams to invoke his right to remain silent was ambiguous or equivocal at best.

■ This court has not addressed whether an ambiguous or equivocal request to remain silent is sufficient to implicate *Miranda*'s protections. *See State v. Jobe,* 486 N.W.2d 407, 415 (Minn.1992). In the context of an ambiguous or equivocal invocation of *Miranda*'s right to counsel protection, when an accused utters a statement that is arguably subject to a construction that the accused is invoking his right to counsel, this court has held that all further questioning must stop, except narrow questioning designed to clarify the accused's true desires respecting counsel may continue. *State v. Robinson,* 427 N.W.2d 217, 223 (Minn.1988).

At the time *State v. Robinson* was decided, many of the federal circuit courts of appeal had adopted the clarifying rule. Indeed, *Robinson* cited a Fifth Circuit decision and a decision of the United States Supreme Court as authority for the rule. 427 N.W.2d at 223. Recently, however, in *Davis v. United States,* the Supreme Court declined to adopt a rule requiring officers to ask clarifying questions when an accused ambiguously or equivocally requests counsel. —— U.S. ——, ——, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994). Instead, the Court held that if the accused's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him. *Id.* The Court adopted this position partially in an attempt to minimize the chance of a confession being suppressed due to subsequent judicial second-guessing of police officers as to the meaning of the accused's statement regarding counsel. *Id.*

In deciding whether to adopt the clarifying approach in the right to remain silent context, we recognize that *Miranda*'s prophylactic procedural safeguards are designed to protect two distinct rights: the right to counsel contained in the Sixth Amendment and the privilege against compelled self-incrimination contained in the Fifth Amendment. When an accused attempts to invoke his right to counsel, he indicates that he feels comfortable dealing with the authorities only with the assistance of counsel. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981) (holding that questioning must cease and police may not re-approach the accused when the accused requests counsel, an additional protection beyond those provided in the right to remain silent context). That is not the case in the right to remain silent context, and therefore, fewer procedural safeguards are appropriate when the accused invokes the

---

**2.** We do not want to overemphasize the significance of the interrogator's subjective state of mind in determining whether a suspect has invoked his right to remain silent; but we note that the facts support Detective Christensen's subjective impression that Williams had not expressed a desire to stop answering all questions.

right to remain silent. *Id.* Because the Supreme Court has held that the Constitution does not require police officers to confine their questioning to clarifying questions when an accused ambiguously or equivocally attempts to invoke his right to counsel, *Davis v. United States,* — U.S —, —, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994), it follows by even greater logic that the Constitution does not require such a clarifying approach when an accused ambiguously or equivocally attempts to invoke his right to remain silent. *See Michigan v. Mosley,* 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975) (distinguishing between the procedural safeguards triggered by a request to remain silent and the greater procedural safeguards triggered by a request for an attorney).

Recently, in *State v. Jobe,* this court held that the defendant had failed to invoke his right to remain silent by responding that he did not want to talk about what he had done the previous evening but was willing to talk about "lighter" subjects. 486 N.W.2d 407, 415 (Minn.1992). This court concluded that the defendant "did not respond to the question by unequivocally asserting the right to remain silent," and consequently, he failed to assert his right to remain silent. *Id.* at 415–16. Recognizing that this court had never explicitly addressed the effect of an ambiguous or equivocal request to remain silent, the court in *Jobe* sought guidance from cases holding that the defendant had failed to invoke his right to remain silent, even though it was arguable in those cases that the defendant either ambiguously or equivocally attempted to invoke the right.[3] *Id.*

In the present case, we extend the *Jobe* court's focus on requiring an unambiguous or an unequivocal invocation of the right to remain silent, and we conclude that nothing short of an unambiguous or unequivocal invocation of the right to remain silent will be sufficient to implicate *Miranda*'s protections. Recognizing that *Miranda* protects two distinct rights, with more protection afforded the right to counsel, we decline to adopt the clarifying approach in the right to remain silent context.

Because Williams's desire with respect to his right to remain silent was ambiguous or equivocal at best, and because questioning may continue when the defendant has not clearly indicated a desire to stop answering questions, Detectives Bozovsky and Christensen were allowed to return to Williams's cell to question him. The detectives appropriately allowed Williams some time to calm down before returning to question him. *State v. Andrews,* 388 N.W.2d 723, 730 (Minn.1986); *State v. Brown,* 345 N.W.2d 233, 238 (Minn. 1984). Five minutes apparently provided Williams with sufficient time to compose himself. When Detective Bozovsky entered Williams's detention cell, Williams was calmly lying on his bed, and Williams had regained his composure by the time he returned to the interview room. In addition, by informing Williams of Mathew's condition, Bozovsky merely informed Williams of the possible charges or evidence against him, which is not improper. *See State v. Pilcher,* 472 N.W.2d 327, 334 (Minn.1991) (stating that it is not improper to inform an accused of the possible charges or evidence marshalled against him).

As a result of Detective Bozovsky's subsequent questions, Williams revealed that he did not desire to remain silent, and indicated instead that he wanted to return to the interrogation room to talk with them further. We

---

**3.** The *Jobe* court relied on: *State v. Nelson,* 257 N.W.2d 356 (Minn.1977), in which the defendant, when asked if he would answer some questions, replied, "It all depends," and this court held that the defendant had failed to invoke his right to remain silent because the defendant's reply merely "indicates he reserved the option to answer only such questions as he wished"; *United States v. Joyner,* 539 F.2d 1162 (8th Cir.1976), *cert. denied,* 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed.2d 593 (1976), in which the defendant refused to tell FBI agents the location of a trunk that had been used as collateral to secure a defaulted loan, and the Eighth Circuit held that the defendant's statement that he would not reveal the location of the trunk was a direct answer freely given, rather than assertion of his right to remain silent; and *People v. Rickard,* 99 Ill. App.3d 914, 55 Ill.Dec. 144, 425 N.E.2d 1317 (1981), in which the defendant answered two questions during the course of a police interrogation by saying, "I won't tell you," and the court held that the defendant had refused to answer two questions but had not expressed a desire to remain silent. 486 N.W.2d at 415–16.

conclude that Williams failed to effectively invoke his right to remain silent. Thus, the trial court had the discretion to admit Williams's confession if this court concludes that Williams knowingly, intelligently, and voluntarily waived his right to remain silent and voluntarily confessed.

## II.

■ Having concluded that Williams failed to invoke his right to remain silent, we must also address whether Williams knowingly, intelligently, and voluntarily waived his right to remain silent and whether Williams voluntarily confessed. Williams claims that his waiver of his right to remain silent was not knowing, intelligent, and voluntary because he was not informed that he could be prosecuted as an adult and he was not informed that he could have a parent or guardian present during questioning. Williams also claims that, even if he knowingly, intelligently, and voluntarily waived his right to remain silent, his confession was involuntary. Williams asserts that his confession was the product of fatigue, confusion, coercion, and duress.

■ On appeal, this court will accept the trial court's findings of fact surrounding the giving of the statement unless those findings are clearly erroneous. *State v. Johnson,* 463 N.W.2d 527, 533 (Minn.1990). But this court will make an independent determination of whether a confession was voluntarily given, applying constitutional principles to the facts as found. *Id.; State v. Linder,* 268 N.W.2d 734, 735 (Minn.1978).

■ For a statement obtained from an accused during custodial interrogation to be admissible, the state must prove by a preponderance of the evidence both that the accused knowingly, intelligently, and voluntarily waived his right against self-incrimination, and that the accused freely and voluntarily gave the statement. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986); *State v. Merrill,* 274 N.W.2d 99, 106 (Minn.1978) (citing *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628, and *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963)). If the police fully advise an accused of his *Mi-*

*randa* rights, and the accused indicates that he understands his rights and nevertheless gives an incriminating statement, the state is deemed to have met its burden of proving that the accused knowingly and intelligently waived his rights. *State v. Andrews,* 388 N.W.2d 723, 730 (Minn.1986); *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628.

In the present case, Williams was fully advised of his *Miranda* rights three different times within a two-hour period. Each time, Williams responded that he understood his rights and that he was willing to talk. That Williams was not again advised of his *Miranda* rights before being informed that Mathew was expected to survive does not necessarily taint his confession. Detective Bozovsky had advised Williams of his rights just one hour earlier, and this warning easily covered the second interview. *See State v. Andrews,* 388 N.W.2d at 731–32 (holding that failure to give accused *Miranda* advisory at later interview, conducted several hours after first interview at which *Miranda* advisory was given, did not render accused confession involuntary, and earlier *Miranda* advisory was adequate to cover second interview).

The issue is whether the lack of a second advisory left Williams unaware of the meaning or seriousness of the second interrogation. *State v. Andrews,* 388 N.W.2d at 731. The circumstances of his arrest and detention, as well as the crime he was being questioned about, make it unlikely that Williams failed to understand the meaning or seriousness of the second interrogation.

Because Williams was not informed that he could be tried as an adult, he claims that his waiver was not knowing. This court's recent decision in *State v. Ouk* encourages police officers to advise juveniles about the possibility of criminal prosecution as an adult when such prosecution is possible. 516 N.W.2d 180, 185 (Minn.1994). Nevertheless, in *Ouk,* we refused to adopt a *per se* exclusionary rule barring the use of a juvenile's confession in a criminal prosecution for a felony when the juvenile is not warned about the possibility of adult prosecution. *Id.* Instead, we adhered to the approach whereby awareness of potential criminal responsibility may often

be imputed to an interrogated juvenile. *Id.;* *State v. Loyd,* 297 Minn. 442, 449–50, 212 N.W.2d 671, 676–77 (1973) (stating if a juvenile is advised of his constitutional rights, he does not have to be specifically informed that adult prosecution could result when the adversary nature of the interrogation is apparent to the juvenile).

In the present case, awareness of potential criminal responsibility may reasonably be imputed to Williams. Williams was not arrested during a routine traffic stop. Instead, several police squad cars surrounded the car using highly adversarial felony arrest maneuvers. Moreover, Williams was questioned about a double homicide and an attempted homicide. From the nature of his arrest and from the nature of the crime, it was foreseeable that this matter would not be disposed of in the juvenile court system. *Cf. State v. Ouk,* 516 N.W.2d at 185 (finding adult prosecution foreseeable when defendant engaged in two-hour standoff with 25 to 30 police officers in connection with his shooting of four victims at point blank range). Those circumstances should have led Williams to conclude he could be prosecuted as an adult. Thus, failure to advise Williams that he could be prosecuted as an adult does not render his waiver unknowing.

■ Because Williams was fully advised of his rights three different times within a two-hour period, and because it is unlikely Williams failed to understand the meaning or seriousness of the second interrogation, the state has met its burden of proving that Williams knowingly and intelligently waived his rights. The remaining issue is whether that waiver was voluntary.

■ In determining whether a juvenile has voluntarily waived his right to remain silent, a court must evaluate the totality of the circumstances. *State v. Ouk,* 516 N.W.2d at 184; *Matter of Welfare of M.D.S.,* 345 N.W.2d 723, 733 (Minn.1984); *State v. Hogan,* 297 Minn. 430, 440, 212 N.W.2d 664, 671 (1973). Factors to be considered in the totality of the circumstances test include the juvenile's age, maturity, intelligence, education, physical deprivations, and prior criminal experience, the presence or absence of parents, the length and legality of detention, the lack

of or adequacy of warnings, and the nature of the interrogation. *Ouk,* 516 N.W.2d at 185.

■ Whether an accused has knowingly, intelligently, and voluntarily *waived* his right to remain silent and whether he has voluntarily *confessed* are two separate issues. *State v. Andrews,* 388 N.W.2d at 730; *State v. Merrill,* 274 N.W.2d at 106 n. 4. But the relevant factors to be considered are the same. *State v. Merrill,* 274 N.W.2d at 106; *State v. Linder,* 268 N.W.2d 734, 735 (Minn. 1978) (holding same totality of the circumstances approach applies in determining whether juvenile voluntarily confessed); Minn.R.Juv.P. 6.01 (listing factors). Thus, the analysis of the two issues significantly overlaps.

■ The rule that a confession must be voluntary is designed to deter improper police interrogation. *State v. Merrill,* 274 N.W.2d at 107–08. By virtue of the Due Process Clause of the Fourteenth Amendment, certain interrogation techniques are so offensive to a civilized system of justice that they must be condemned. *Colorado v. Connelly,* 479 U.S. at 163, 107 S.Ct. at 519–20. But the police must also be allowed to encourage suspects to talk when the suspect has not clearly refused. *State v. Merrill,* 274 N.W.2d at 108. "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. at 167, 107 S.Ct. at 522. " '[T]he trustworthiness of a confession should not in every instance be discounted because investigative officers in their interviews might have made discursive or imprecise statements to the defendant.' " *State v. Merrill,* 274 N.W.2d at 107 (quoting *State v. Biron,* 266 Minn. 272, 282, 123 N.W.2d 392, 395 (1963)). Instead, to determine whether a confession is voluntary, a court must look at the totality of the circumstances.

In *State v. Garner,* this court held that the accused had not voluntarily confessed because the interrogating officer intentionally lied to the accused, threatened to charge him with as many crimes as possible, and physically approached him in an intimidating way.

294 N.W.2d 725, 727 (1980). Significantly, the accused in *Garner* was intoxicated during his interrogation, which increased his susceptibility to such techniques. *Id.* In *State v. Orscanin,* however, this court held that the accused voluntarily confessed. 283 N.W.2d 897, 901 (Minn.1979), *cert. denied,* 444 U.S. 970, 100 S.Ct. 464, 62 L.Ed.2d 385. At the time of the confession, the accused in *Orscanin* was 18 years old, had a formal education to the 10th grade, and had never been in adult court. *Id.* (Wahl, J., dissenting). After his apprehension, he was placed in a cell, measuring approximately 6 feet by 10 feet, which contained only a bed. *Id.* He was required to eat in the room, was allowed out only to take a shower and to use the toilet, and was allowed no radio, television, or any form of recreation. *Id.* He was kept in this cell for six days. *Id.* During those six days, he did not see a lawyer, his parents, nor any other visitors other than a single visit from his parole officer on the fourth day. *Id.*

In the present case, Williams was held for six and one-half hours in a detention cell containing a bed, a toilet, and a sink with running water, was allowed to use his asthma inhaler, and had his medical needs attended to. During his questioning, Detective Christensen hypothesized about what physical evidence might be discovered at the homicide scene and called Williams a liar for denying involvement in the homicides. In addition, Detective Bozovsky told Williams that Mathew would be able to identify his assailant, which was pure speculation. These techniques were not the kind of statements that would make an innocent person confess, and they hardly meet the standard of stress-inducing techniques required to invalidate a confession.[4] In addition, unlike the accused in *State v. Garner,* the trial court in the present case found that Williams was not intoxicated during his interrogation. The testimony of several police officers who ob-

served Williams at the Brooklyn Park police station supports the conclusion that this finding is not clearly erroneous.

The trial court also found that Williams's prior experience with the criminal justice system supported the conclusion that his confession was voluntary. The parties stipulated that ten delinquency petitions were filed against Williams while he was between 12 and 15 years old. Of these ten petitions, Williams was determined to be delinquent on six, four of which were felony-level offenses. From at least ten prior contacts with the police, Williams had been advised of his *Miranda* rights several times and had invoked his right to remain silent on at least one of these occasions. In addition, instead of being intimidated during his interrogation, Williams's behavior of standing up to the detectives evinces his ability to withstand pressure. *State v. Moorman,* 505 N.W.2d 593, 600 (Minn.1993) (finding defendant's prior experience with the criminal justice system significant factor in conclusion that confession was voluntary); *State v. Slowinski,* 450 N.W.2d 107, 111 (Minn.1990) (same).

On the above facts, we conclude that Williams knowingly, intelligently, and voluntarily waived his right to remain silent, and we conclude that Williams voluntarily confessed. Therefore, constitutional principles did not require the trial court to exclude Williams's confession from evidence.

### III.

Williams further asserts that his confession should have been excluded from evidence because the interrogating officers failed to tape record his entire interrogation as required by *State v. Scales,* 518 N.W.2d 587 (Minn.1994), *reh'g denied* (Minn., Aug. 10, 1994). In Minnesota, custodial interrogations conducted at the police station must be

---

4.   *Cf. State v. Garner,* 294 N.W.2d at 727; *State v. Moorman,* 505 N.W.2d 593, 600 (Minn.1993) (distinguishing *State v. Garner,* and holding that interrogating officer's telling accused evidence linked him to murder, when, in fact, it did not, did not render confession involuntary because additional misconduct of threats, physical intimidation was absent.) *Cf. State v. Slowinski,* 450 N.W.2d 107, 112 (Minn.1990) (holding that even though police may have improperly suggested to defendant that they had influence with the county attorney to argue for psychiatric help or mitigating circumstances to first-degree murder, these statements did not render defendant's confession involuntary because they were not the kind of statements that would make an innocent person confess).

recorded in their entirety. In *State v. Scales*, we held that

all custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention. If law enforcement officers fail to comply with this recording requirement, any statements the suspect makes in response to the interrogation may be suppressed at trial.

518 N.W.2d at 592. This court imposed the recording requirement in an effort to avoid factual disputes underlying an accused's claims that the police violated his constitutional rights. *Id.* at 591–92.

The recording requirement imposed by *State v. Scales* does not apply to the present case for two reasons. First, the rationale underlying the recording requirement is to avoid factual disputes underlying an accused's claims that the police violated his constitutional rights. In the present case, no fact dispute exists. Instead, what is disputed is the legal significance of undisputed facts. Thus, imposing the recording requirement in the present case would not further its underlying rationale.

Second, the *State v. Scales* opinion explicitly applies only prospectively from June 30, 1994. *Id.* at 593. Williams's interrogation occurred on October 13, 1992. Notwithstanding this court's earlier urging of law enforcement officers to record interrogations, that was not the strict rule at the time of Williams's interrogation. Thus, Detectives Bozovsky and Christensen had no notice that their failure to record the entire interrogation was fatal. Because the detectives complied with the Brooklyn Park police department's standard procedure by not electronically recording the entire interrogation, and because the detectives did record Williams's ultimate confession, the trial court did not abuse its discretion in admitting Williams's partially-taped interrogation and confession into evidence.

Nevertheless, Williams cites *Powell v. Nevada*, —— U.S. ——, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994), and argues that the recording requirement should be applied retroactively to his case because "a newly declared constitutional rule must be applied to criminal cases pending on direct review." This court, however, imposed the recording requirement "in the exercise of our supervisory power to insure the fair administration of justice." *State v. Scales*, 518 N.W.2d at 592. We explicitly chose not to base the recording requirement on the Due Process Clause of the Minnesota Constitution. *Id.* Thus, the recording requirement is not a newly declared constitutional rule and need not be applied to criminal cases pending on direct review.

## IV.

Finally, Williams maintains that the inculpatory statements he made while being held at the Juvenile Detention Center should have been excluded from evidence "as a matter of fundamental fairness." Williams appropriately does not rely on his Fifth Amendment privilege against compelled self-incrimination to support his claim that those statements should be suppressed because they were not obtained through custodial interrogation or its functional equivalent. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (defining "interrogation"). Rather, as the trial court correctly concluded, Williams volunteered those statements to either other residents or to Juvenile Detention Center employees. *Cf. State v. Karow*, 154 Wis.2d 375, 453 N.W.2d 181, 185 (1990) (holding that defendant's inculpatory statement made to juvenile intake worker was spontaneously volunteered and did not result from interrogation or its functional equivalent), *pet. for review denied*, 457 N.W.2d 323 (Wis.1990). A volunteered statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.1992), *cert. denied*, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434; *see also State v. Hawkins*, 511 N.W.2d 9, 12 (Minn.1994) (holding that no violation of Sixth Amendment right to counsel occurs if, after right attaches, state does

not deliberately elicit incriminating statements from the defendant).

Instead, because Williams was allegedly led to believe that he was in a safe place where people cared about him, he claims that his incriminating statements made while being held at the Juvenile Detention Center should be excluded from evidence as a matter of fundamental fairness. The only authority Williams cites for this conclusion are two foreign jurisdiction cases that came to the opposite conclusion. Because the record reveals that no Center employees deliberately exploited their relationship with Williams in eliciting inculpatory statements from him, fundamental fairness does not require exclusion of Williams's inculpatory statements made while being held at the Center.

Affirmed.

COYNE, Justice (concurring specially).

In my opinion, there can be no question that there was no violation of the defendant's constitutional rights, that he received a fair trial, and was convicted on evidence properly admitted. I cannot, however, regard the defendant's outburst in response to Detective Christensen's declaration that defendant lied as either an equivocal or ambiguous invocation of his Fifth Amendment privilege against self-incrimination. It seems to me that when the defendant stood up in agitation, shouted "I don't have to take any more of your bullshit," and stalked out of the interrogation room, he was making a time-honored childish statement—"I won't *listen* to anything more you have to say," not "I want to remain silent."

There are times, of course, that police interrogation is too aggressive and the will of the suspect is overborne, and in such cases the confession is, and should be, suppressed. But police should be allowed to assume that a suspect is willing to give an account of his whereabouts and his actions at the time of the crime in question until the suspect clearly claims the protection of the Fifth Amendment.

That the defendant himself did not intend by his outburst to invoke the Fifth Amendment is apparent from his willingness to renew the interrogation when informed of the survival of the four-year-old boy who had been stabbed in the murderous attack that left his mother and sister dead.

Because the defendant's contention that he invoked the protection of the Fifth Amendment appears to be only an afterthought, I join the affirmance of his conviction.

PAGE, Justice (concurring in part, dissenting in part).

I concur in the result reached by the court in today's decision. I respectfully dissent, however, from that part of the court's decision which holds that Williams was equivocal in invoking his right to remain silent when he broke off the interrogation with Detectives Christensen and Bozovsky.

The United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), recognized the need to protect a defendant's right to both consult with an attorney and remain silent. Specifically referring to the invocation of the right to remain silent, the Court stated "[i]f the individual indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. at 1627 (emphasis added). The invocation of the right to remain silent requires that all questioning cease in order to prevent "police from 'persisting in repeated efforts to wear down [the accused's] resistance and make him change his mind.' " *Smith v. Illinois*, 469 U.S. 91, 95 n. 2, 105 S.Ct. 490, 493 n. 2, 83 L.Ed.2d 488 (1984) (quoting *Michigan v. Mosley*, 423 U.S. 96, 105–06, 96 S.Ct. 321, 327, 46 L.Ed.2d 313 (1975)).

Here, the manner utilized by Williams to indicate that he did not wish to be interrogated further was to remove himself from the interrogation room. The court's argument appears to be that in standing up, turning toward Detective Christensen, and saying "I don't have to take any more of your bullshit," then walking out of the room, Williams left some doubt as to whether he wanted the interrogation to continue. I believe, however, that there was nothing equivocal, uncertain, or doubtful in the manner he chose to invoke his right to remain silent. By leaving

the interrogation room, Williams made a clearer and stronger statement of his desire to remain silent than any verbal statement he could have made. The message to be taken from Williams' walking out of the interrogation room in the manner he did was that he did not want to talk to the officers any longer and that he did not want the officers to talk to him any longer. While the court emphasizes that Williams never stated that he wanted to stop answering questions, the fact is that by walking out of the interrogation room he made a far more effective statement. By leaving the room, Williams made further questions from the officers and further answers on his part impossible.

In support of its conclusion that Williams was equivocal in invoking his right to remain silent, the court makes much of the fact that Williams appeared to be angry with Detective Christensen and not with Detective Bozovsky. The fact that he may only have been angry with Detective Christensen does not aid the analysis of whether the right was properly invoked for two reasons: first, and most important, is the fact that Williams walked out on both officers, not just Detective Christensen; and second, the fact that Williams may have been angry when he invoked his right to remain silent does not make an unequivocal invocation of the right any less effective.

Having unequivocally invoked his right to remain silent, Williams was entitled to have the right "scrupulously" honored. *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975). In *Davis v. United States,* Justice Ginsburg, in a concurring opinion, noted that "[w]hen a suspect understands his (expressed) wishes to have been ignored * * * in contravention of [his] 'rights' just read to him by his interrogator, he may well see further objection as futile and confession (true or not) as the only way to end his interrogation." — U.S. —, —, 114 S.Ct. 2350, 2362, 129 L.Ed.2d 362 (1994).

Detectives Christensen and Bozovsky failed to scrupulously honor Williams' right to remain silent. Williams was approached in his cell within five minutes of the time he invoked his right to remain silent. When the detectives entered his cell, Detective Bozovsky informed Williams that Matthew Hage was expected to live and, without any factual basis, informed Williams that Matthew Hage would be able to identify him. It was at that point that Williams broke down and admitted he had been in the house. By failing to wait a significant period of time before continuing the interrogation, the officers failed to scrupulously honor Williams' invocation of the right to remain silent and implicated the concerns raised by Justice Ginsburg in *Davis.*

Thus, I believe it was error for the trial court to have admitted into evidence any statements Williams made during the interrogation after he invoked his right to remain silent. I also believe, however, that the error was harmless beyond a reasonable doubt because the other evidence of Williams' guilt produced at trial was overwhelming. *See State v. Robinson,* 427 N.W.2d 217, 224 (Minn.1988). Therefore, Williams' conviction is properly affirmed.